## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF THE STATE OF GEORGIA,

## AT DECATUR,

## AUGUST TERM, 1848.

No. 38.—James A. Miller and others, plaintiffs in error, *vs.* Stephen G. Cotten and others, defendants in error.

[1.] Though a trust in land need not be created in writing, yet, to take the case out of the Statute of Frauds, it must be proved by writing, and parol testimony is inadmissible for that purpose.

[2.] Whenever a case of fraud is made by the bill, parol evidence will be admitted for the purpose of establishing that case. But the facts upon which relief is prayed, on the score of fraud, must be plainly, fully and distinctly alleged.

[3.] Even in cases of fraud, parol evidence is not regarded with favor; and the Court will not act upon it if it be not strong and irrefragable, particularly where there has been long acquiescence on the part of the complainants.

[4.] To justify the specific execution of a parol agreement, its terms and conditions should be precisely stated. If the contract, which is sought to be performed, is vague and uncertain, or the evidence does not support it, Equity will not enforce it.

[5.] If a testator has affected to dispose of property, which is not his own, and has given a benefit to the person to whom that property belongs, the devisee or legatee accepting the benefit so given to him, must make good the testator's attempted disposition. For the doctrine of election, is, that he who accepts a benefit under a deed or will, must adopt the whole contents of the instrument, conforming to all its provisions, and renouncing every right inconsistent with it.

[6.] A Court of Equity will not decree the cancellation of conveyances, where any thing has been received, until re-payment is made.

In Equity, in Crawford Superior Court. Before Judge FLOYD, February Term, 1848.

The facts are incorporated into the opinion of the Court.

HUNTER & BLAKE, for plaintiffs in error.

Mr. HUNTER, for the plaintiffs in error, made the following points :

1st. In this case, there is a prayer for specific and general relief. Complainant is only entitled, under general prayer, to such relief as in consistent with the case made, and the special prayer. 2 *Kelly,* 413. 1 *Dan. Ch. Pr.* 220, '2.

2d. Parol evidence is inadmissible to contradict or add to the terms of a deed, and to create a trust in land, especially after the death of the nominal purchaser. *Hovenden on Frauds,* 87. 1 *Hen. Bl.* 659. 1 *Cox,* 15. *Sugden on Vendors,* 170,207. 2 *Bro. Ch. R.* 115. *Roberts on Frauds,* 99 7 *Vesey, Jr.* 211. 13 *Mass. R.* 443. 1 *J. Ch. R.* 339, 425, 273, 593. 1 *Bay R.* 461. 6 *J. R.* 21.

Ebenezer Duffey's heirs bound by recitals in his deed to Daniel Duffey. 9 *Wend.* 209. 1 *Green.* 26, '7. 1 *Kelly,* 550. 4 *Price,* 453. 1 *J. Ch. R.* 329. 1 *Bacon,* 165.

Parol evidence is inadmissible to establish the agreement set up in complainant's bill, on the ground of *implied trust;* this case not making *such a trust,* and the bill not praying a declaration of trust, but the specific performance of the alleged parol contract to re-convey said premises at the death of Daniel Duffey. 1 *Green.* 304. To take a parol contract to convey land out of the Statute of Frauds, on the ground of fraud, the fraud must not be constructive but actual; and it must be in the *making* of the instrument, for no resulting trust can arise upon any thing which takes place *after the making of the deed,* or other instrument. 1 *Henry Blk.* 659. 3 *Vesey, Jr.* 696, 713, *(note.)* 1 *J. Ch. R.* 429. 2 *do.* 404. 5 *do.* 1. 2 *Kelly,* 296.

3d. A parol agreement to convey land, will not be enforced in Equity, where the agreement is denied by the answer to complainant's bill, and the Statute of Frauds relied upon as a defence. 2 *Story's Com.* 59, 60. 1 *Vernon,* 151. 6 *Vesey, Jr.* 12. The deed from Ebenezer to Daniel Duffey, is no evidence of the

agreement charged in complainant's bill, and the only evidence that a deed was taken in pursuance of said agreement, is the parol declarations of Daniel Duffey himself, which, as I have already shown, are inadmissible. The agreement set up must first be established according to law, and that this deed was taken in pursuance of said agreement. 2 *Story's Com.* 66, '9. 1 *Bacon*, 181, '7. *Roberts on Frauds*, 105, 115. *Mitford's Ch. Pl.* 329.

4th. A Court of Equity will not decree the specific performance of a parol contract to convey land, when it has no means of carrying it into effect; where the terms of the contract are not clearly stated, nor of any agreement other than the precise agreement set up by complainant's bill. *Roberts on Frauds*, 106, '7. 2 *Vesey, Jr.* 242, '4. 6 *Vesey, Jr.* 328. 3 *Vesey, Jr.* 713, *(note.)* 3 *Merivale*, 451, '4. 2 *Dan'l's Ch. Pr.* 248. 2 *Story's Com.* 69, 71, '5, '9, 743. 7 *Vesey, Jr.* 30. 1 *J. Ch. R.* 273, 593.

5th. This is a case of election as to all the complainants, and the Court below erred in deciding that it was a case of election only, as to John W. Duffey. The rule in Equity is, that a party taking a benefit, although it be but a *contingent benefit*, under a will, must conform to all of its provisions, and cannot claim, under and against the will at the same time; and if he has, by unequivocal acts, elected to abide by the will, he cannot afterwards dispute its provisions; but if he elects to insist on his independent title to property conveyed by the will, to a third person, he must make compensation out of the legacy bequeathed to him by the will, to the disappointed devisee. 2 *Story's Com.* 353 *to* 360. 2 *Vesey, Jr.* 372, 562, 693. 1 *Vesey, Jr.* 523. 13 *do.* 220, '8. 2 *Maddock's Ch. R.* 47. 1 *Swanston*, 381, 413, 25. 2 *Schoales & Lefroy*, 133. *Hovenden on Frauds*, 108. 1 *Kelly*, 501, 10.

6th. The deed from Eben. to Dan. Duffey, if set aside in Equity, upon the ground of fraud, the rescision will be made only upon the condition that complainants pay to the estate of Dan. Duffey what is equitably due said estate from Ebenezer Duffey, deceased. 1 *J. Ch. R.* 478. 1 *Story's Com.* 337. 3 *Vesey, Jr.* 170. 1 *do.* 215. 1 *Vernon R.* 100, 237. 2 *Swift*, 74. 1 *Story's Com.* 81, '2. 19 *Vesey, Jr.* 129. 2 *Comyn*, 473. 1 *Ver.* 480. 2 *Story's Com.* 6, 7

7th. Where, at the hearing, a complainant fails to make out his case, as stated in his bill, or from defect of proof, or otherwise, shows that he is not entitled to recover, it is the duty of the Chan-

cellor to charge the jury that he is not entitled to recover. 2 *Vesey, Jr.* 242. 5 *do.* 457. 7 *do.* 30. 14 *J. R.* 516. 2 *Story's Com.* 743, '4. Upon these grounds and authorities, we contend that the judgment of the Court below is illegal, and should be reversed.

A. HAMMOND, for defendant in error, cited and commented on the following authorities.

1 *Porter,* 328. 1 *Fairfield,* 1, 23, 24. 1 *John. Ch.* 582. 2 *do,* 406. 1 *Green. Ev.* §266. 7 *Pick.* 533. 4 *Kent's Com.* 305. 1 *Lomax,* 202, '3. 1 *Powell on Mort.* 151, *a.* 3 *Mason's C. C. U. S.* 301. 15 *Mass. R.* 203. 12 *do.* 107. 1 *Washington,* 21. 2 *Atkyns,* 256. 1 *Paige's C. Rep.* 152. 14 *Vesey,* 215, 234, 243. 1 *Murphy,* 116, 141. 1 *Story's Eq. J.* §§239, 251. 2 *Story's Eq.* §1097. *C. on Contracts,* 29. *Clancey on M. W.* 249. 3 *Mylne & Craig,* 171. 1 *Phillips' Ev.* 578, *notes,* 1033. 3 *Kelly,* 256.

*By the Court.*—LUMPKIN, J. delivering the opinion.

In 1827, one Ebenezer G. Duffey, being the owner of 303¾ acres of land, to-wit : lot No. 254, and one half of lot No. 255, in what was originally Houston, now Crawford county in this State, conveyed the same, by deed, to Daniel Duffey, his father. The only consideration mentioned in the deed, is the sum of $1000, which the bargainer acknowledges to have received as payment in full for the land, and immediately follows a clause, exonerating the bargainee therefrom. Shortly after the purchase, Daniel Duffey went into possession and remained on the land till his death, in 1838, and having devised the land by his will to his son, Jesse Duffey, who was living with him on the premises, the devisee continued in the occupancy till October, 1839, when he died intestate. His administrators took possession, and have held the land ever since. In 1845, Stephen G. Cotten and Catharine, his wife, formerly Catharine Duffey, widow and relict of Ebenezer G. Duffey, filed their bill in the Superior Court of Crawford county, in which they seek to recover one half of this land, together with a moiety of the rents, issues, and profits since the death of Daniel Duffey. And it is upon the final trial of this bill, that the errors complained of are alleged to have been committed.

As preliminary to the examination and right adjudication of the questions presented in the record and bill of exceptions, it is important, nay, indispensably necessary, to ascertain, and define accurately, the nature and object of the bill filed by Cotten and wife. And the principal difficulty we have had to encounter, was to satisfy ourselves with certainty on this point. Is it a bill for *specific performance ?*   Or is it brought to declare a *resulting trust?* After the most patient and careful inquiry, our conclusion is, that the design of this proceeding is the execution of a parol declaration of a trust in the remainder of this land, after the fruition and termination of the life estate of Daniel Duffey.   It addresses itself to the conscience of the defendants, to wit : The legal representatives of the estates of Daniel and Jesse Duffey, to discover the *trust agreement*—it prays the performance of this agreement.   In corroboration of this view, we may refer to the character and capacity in which the complainants come into Court. It is not as the heirs at law of Ebenezer G. Duffey, to whom this land would descend by operation of law, in the event of the deed from Ebenezer G. to Daniel Duffey, being set aside on the ground of *fraud.*   But they apply, as before stated, as *remaindermen in trust,* asking to have the secret trust between the father and the son, executed in their behalf.   So far from repudiating the deed of Daniel Duffey, on account of the fraud in its inception and procurement, they set up this conveyance.   They concede that under and by virtue of it, Daniel Duffey had a good estate for and during the term of his natural life, and they expressly waive calling upon his executors for an account of the rents, issues, and profits which accrued previous to his death.   They demand that by a decree in Chancery, the parol trust may be executed.

[1.]  Parol testimony was offered to establish this trust, or rather to engraft it upon the deed.   It was objected to by the solicitor of the defendants, but allowed by the Court ; and this is the first error complained of.   Now if we are right in the view we have taken of the nature and object of this bill, it fixes conclusively the law of this case, for the 7th sect. of the Statute 29 *Car. II, c.* 3, (usually called the Statute of frauds,) enacts, " That all declarations or creations of trusts or confidences of any lands, tenements, or hereditaments, shall be manifested or proved by writing, signed by the party who is by law enabled to declare such trust, or by his last will in writing, or else shall be void."   If the

position assumed, therefore, be tenable, the testimony adduced was inadmissible.

The 8th section exempts from the operation of the Act, trusts arising or resulting by the implication or construction of law. What then are *resulting trusts*, which before the Act were disposable by a bare declaration by parol, and are considered since its passage on the same footing ? They were said by Lord Hardwick, in *Lloyd vs. Spillet*, 2 *Atkins*, 148, 150, to arise on three cases ; first, where the estate is purchased in the name of one person, but the money paid for it is the property of another. Secondly, where a conveyance is made in trust, declared only as to part, and the residue remains undisposed of, nothing being declared respecting it. And thirdly, in certain cases of fraud. In all these cases, parol evidence is admissible, to establish the collateral facts, from which a trust may legally result, though received with great caution. Mr. Roberts, in his Treatise on Frauds, p. 97, seems to think that the Chancellor must have been incorrectly reported, in his classification of resulting trusts. At any rate, he shows conclusively, that the cases of constructive trusts, or such as arise by operation of law, are almost innumerable. With this controversy, however, we have nothing to do at present.

[2.] We fully recognise the doctrine then, that a Court of Equity will not permit the Statute of frauds, to be set up as a defence by a party infected with fraud; and that parol trusts of real estate, may be established in direct contradiction to the Statute, on the ground of fraud. And, that whenever a case of *fraud* is made by the bill, parol evidence will be received for the purpose of sustaining that case, even though the effect of such evidence be, to alter or vary a written instrument, and although the benefit of the Statute be insisted upon by the defendant. For, as was said by Lord Thurlow, " The moment you impeach a deed for fraud, you must either deny the effect of fraud on a deed, or you cannot but be under the necessity of admitting parol evidence to prove it."  *Shelburne vs. Inchinquin*, 1 *Bro. C. C.* 350.

But in all such cases, the bill must contain allegations of fraud. Many precedents might be cited in support of this principle. Let one or two suffice. *Truham vs. Child*, 1 *Bro. C. C.* 93, was a bill filed to redeem, suggesting that it was part of the agree-

ment that it should be redeemable, but the agreement left out of the deed, on the idea that if inserted, the transaction would be usurious. Parol evidence offered to this, but not admitted to contradict the deed, not being charged to have been omitted by fraud. By the Lord Chancellor, "Whether this question arises upon the Statute, or at Common Law, I do not see much difficulty. The rule is perfectly clear, that where there is a deed in writing, it will admit of no contract that is no part of the deed. Whether it adds to or deducts from the contract, it is impossible to introduce it on parol evidence. It is contended to be the general authority of a Court of Equity to relieve in cases of *fraud, trust,* accident or mistake ; and that this applies to agreements as well as to other subjects. This must always clash with the argument drawn from the Statute. It is admitted, that the deed will bind if no fraud is committed, but objected, that where fraud interferes, there the evidence may be introduced. The objection is founded on a great deal of wisdom and good sense. But the question is, if it were always to be admitted, whether it would not be subversive of justice? The Court has held that it would. If the agreement had been varied by fraud, the evidence would have been admissible. The argument, then, must be to impute fraud to the party. Here there was no intention that the agreement should make any part of the instrument. If *the bill afforded a proper allegation, it would then be time enough to consider the evidence; but certainly there is no fraud stated on the face of the bill. The bill does not go to destroy, but to affirm and reform the contract. It must be dismissed."*

So, in *Portmore vs. Morris,* 2 *Bro. C. C.* 219, the question being upon the admissibility of parol evidence of the agreement, that the annuity should be redeemable, His Honor said, "Before the Statute of frauds, parol evidence could not be admitted to contradict written agreements, except in very particular cases indeed; and after, *deeds* were under the same rules. If fraud was imputed, it might be done here, but it is dangerous to depart from deeds. It might be the intention, that the annuity should be redeemable, but I can only get at it by demolishing one of the foremost rules of law ; therefore, I reject the evidence."

In *Haynes vs. Hare,* 1 *H. Black.* 664, Lord Loughborough, after commenting on the case in second *Brown,* remarks, " It is not necessary to cite any case to prove the proposition, that parol ev-

idence of a parol communication between the parties, ought not to be received to add a term, not inserted in the specific agreement which they have executed; and for the plain reason, that what passed between them in that communication, may have been altered and shifted in a variety of ways; but what they have signed and sealed, was finally settled. It would destroy all trust; it would destroy all security, and lay it open, unless the parties are completely bound by what they have signed and sealed. There is nothing so dangerous, as to permit deeds and conveyances, after the death of the parties to them, to be liable to have new terms added to them, on the disclosure of witnesses who can meet with no contradiction."

The facts of this case strikingly illustrate the correctness of the foregoing observations. Aware of the rule that Courts look with great jealousy upon all transactions entered into with persons in imprisonment, or under terror or apprehension, the complainants sought to prove, and successfully too, that the deed of conveyance from Ebenezer to Daniel Duffey, was procured while the former was in jail, in Jones county, waiting his trial for murder. One witness swears positively, that the father admitted that such was the fact. Unfortunately, however, there is record evidence of the impossibility of this statement being correct. Young Duffey was sentenced to the Penitentiary, on the 2d of May, 1827; the certificate of the keeper shows that he was committed on the 5th, and the deed bears date the 14th of July; more than two months thereafter.

Another witness testifies, that the reason assigned by Daniel Duffey, for wishing to get a title to the land, was, his fear that Smith & Jones, the attorneys of his son, would get it for their fees. Whereas, one of these gentlemen, still in life, whose character for truth is above reproach, and whose memory could hardly be at fault respecting a transaction in which he was so deeply and directly concerned, swears that Daniel Duffey himself, paid the counsel of his son for his defence in the criminal prosecution, $1100! We can but be struck with the exact identity between this sum, and the consideration specified in the deed.

How frail and fallible is memory! History records a few examples, of men of whom it may be said, that whatever knowledge they acquired, either sensible or intellectual, remained as indelibly fixed upon their minds, as if it were engraved on a rock.

Seneca reports of Hortensius, that he could repeat at night, the prices and purchasers of every article sold at auction throughout the day; and of himself, that he repeated two thousand names in the same order in which they were spoken to him; and it is told of Cyrus, that he could salute all the soldiers in his vast army by their names, respectively; and of an Englishman, that he recited *verbatim*, one of *Voltaire's* great poems, from having heard it read once by its author to Frederick of Prussia. But these are rare instances. Usually, the impressions made on the memory resemble much more the traceless track of the arrow through the air, than the enduring hieroglyphics upon the pyramids and obelisks of ancient Egypt. Many memories are mere seives. And I would sooner trust the smallest slip of paper for truth, than the strongest and most retentive memory, ever bestowed on mortal man. I once preferred a claim in behalf of one of the frontier settlers of middle Georgia, for revolutionary services, renderen as a guide to the American army in its retreat before Cornwallis. He was a preacher of the gospel, and one of the best men I ever knew, and so reported and esteemed among all his acquaintances; but it was pretty well ascertained, that he was at the time several miles distant from the theatre of his fancied achievement. Things are told to persons, till they verily believe that they witnessed them; and we repeat events until we are ready to swear, in the utmost sincerity, that we are spectators of their occurrence.

Mr. Greenleaf, in his treatise upon the law of evidence, remarks: " With respect to all *verbal* admissions, it may be observed that they ought to be *received with great caution.* The evidence, consisting, as it does, in the mere repetition of oral statements, is subject to much imperfection and mistake; the party himself, either being misinformed or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens, also, that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party did actually say." 1 *Green. Ev.* 233.

In *Law vs. Merrills,* 6 *Wend.* 277, Chancellor Walworth observes: " Evidence to establish a fact by the confessions of the party, is the most dangerous that can be admitted in a Court of Justice, and the most liable to abuse. Although a witness is per-

fectly honest, it is impossible, in most cases, for him to give the exact words in which an admission was made. And sometimes, even the transposition of the words of a party, may give a meaning entirely different to that which was intended to be conveyed to the witness."

Mr. Justice Sutherland, in *Martin vs. Martin,* 1 *Wend.* 652, says: "It has often been said, both by Judges and elementary writers, that proofs of the declarations or confessions of parties, is the most unsatisfactory species of evidence, on account of the facility with which it may be fabricated, and the impossibility of contradicting it; and because the slightest mistake, or failure of recollection, may wholly alter the effect of the declaration."

It has been the constant policy of this Court since its organization, to limit and restrict, as much as possible, parol testimony, when it interferes with written evidence. And we have been induced to made these general observations and quotations, not merely to sustain and justify our course, but to suggest, also, whether further legislative reform might not be beneficially applied in this behalf. We would venture respectfully to recommend Lord Tenterden's bill for rendering a written memorandum necessary to the validity of certain promises and engagements, to the consideration of the law making power. Experience has tested and demonstrated its wisdom.

In constructive frauds, such as in transactions with an expectant heir, or between guardian and ward, trustee and *cestui que trust,* or attorney and client, the relation between the parties is of itself, sufficient to raise the presumption against the propriety of the transaction, so as to throw upon the parties who endeavored to support it, the burden of establishing its validity. *Hill on Trustees,* 166. And there are contracts between *parent* and *child* which stand on the same principle. 1 *P. Wms.* 639. But there are cases where the law, in its tenderness, considers the party as not a free agent, or capable of protecting himself, but standing *in vinculis.* And the maxim is, *quod alias bonum et justum est, si per vim vel fraudem petatur malum et injustum efficeter.* 3 *Co. R.* 78.

No such case is made in this bill, and hence, no such presumption arises as in that class to which we have refered, to displace the claim of Daniel Duffey, in whom the legal title to this land exists, on the score of actual fraud. The bill should not on-

ly have made a proper case, but have been brought by proper parties, to wit: the heirs at law of Ebenezer T. Duffey.

[3.] But even then, this parol evidence would not be regarded with favor, and the Courts could not act upon it unless it be strong and irrefragable. 1 *Bro. C. C.* 341. 6 *Ves.* 334. Or if it be contradicted or contravened by other testimony. 3 *Ves.* 154. Especially after the lapse of some eighteen or twenty years, since the conveyance was executed. "A Court of Equity, which is never active in relief against conscience and the public convenience, has always refused its aid to stale demands, when the party has slept upon his rights and acquiesced a great length of time." By Lord Camden, in *Smith vs. Clay*, 3 *Bro. C. C.* 639, *n.*

There are cases, I know, where persons have obtained conveyances of property, upon a parol assurance that they would dispose of it, either wholly or partially, in a particular way, and Courts of Equity have compelled the performance of such engagements. *Prec. Chan.* 3. 2 *Atk.* 987. *Sim.* 649. 1 *Atkins, 5* 447. 2 *V. & B.* 262. 2 *Vern.* 99. *Ib.* 559. But by looking into these cases, it will be found that they all proceed upon the original fraudulent intent of the party, and he is for that reason treated as a trustee for the person, whom he has thus, by some misrepresentation, or concealment of facts, or both together, induced to execute the instrument. Such is not the case now under consideration. The charge in the bill, and the only complaint, is that Daniel Duffey, after entering upon the land, by virtue of his deed, and enjoying it during his life—failed at his death to convey it to the widow and child of his son, in fulfilment of his parol agreement to that effect. We think that the testimony should have been excluded. We have read it carefully, and are further of the opinion, that even if the evidence were admissible, it is so loose as to be wholly insufficient to establish such a trust as a Court of Equity will recognise and enforce.

But if we are wrong on this point, and it is human to err, there are other serious, if not insurmountable obstacles to be overcome before the complainants are entitled to a decree.

[4.] A bill for the specific performance of a contract, or execution of an alleged agreement, should be so definite and precise in its terms, as that neither party can reasonably misunderstand them. If the contract set forth be vague and uncertain, or the

evidence to establish it be insufficient, a Court of Equity will not interfere to grant relief.

In *Mortimer vs. Orchard*, 2 *Ves.* 243, the Lord Chancellor says, " This case does not turn upon how far a written agreement, not according to the Statute, which is only a parol agreement, shall be established. The bent of my mind is strongly in favor of the wisdom of the Statute. I am, therefore, rather against the cases which have trenched upon it. But this is not that sort of a case. The plaintiff has prayed specific performance of a given agreement, set out in his bill, of which he has given evidence in writing, which makes it no more than a parol agreement; but the parol agreement proved is quite different. The decree upon the prayer of this bill is impossible, for then, I must decree contrary to the evidence for the plaintiff."

In *Bromley vs. Jeffries*, 2 *Vernon*, 416, the Court, upon the hearing, refused to decree specific performance of the contract, from the uncertainty of it. And in *Colson vs. Thompson*, 2 *Wheat.* 336, the Court say, " The allegations in the bill in relation to this agreement which is sought to be specifically executed, are wholly unsupported by the evidence in the cause. This defect in the proof, would seem to be fatal to the pretensions of the complainant. The contract sought to be specifically performed, ought to be certain and precise in its terms, and proved as laid."

Now, how stands this case? The bill alleges that the terms of the agreement were, that Daniel Duffey, " at his death, would re-convey the land to complainant, Catharine, and her son John Wesley Duffey, by such legal instruments that they should have a home during his life, and be supported thereafter out of said land, whether the said Ebenezer was condemned or acquitted." I repeat, this is the agreement stated in the bill, and however vague and indefinite, nevertheless, had it been supported by the proof, specific performance might possibly have been decreed. But what is the contract proven? Woodard swears that Daniel Duffey frequently visited his father's house, and repeatedly mentioned to him, and in his hearing, what property the widow of his son Ebenezer was entitled to; and he recollects of his enumerating, among other things, several negroes, and the land on which they were then living together, in Crawford county, the same which is in dispute. He thinks Daniel Duffey's object in

Miller and others *vs.* Cotten and others.

speaking to him of the property of the widow, was to induce witness, who was a young man, to address her.

It would appear from the evidence of Woodard, that the interest in the land was vested exclusively in the widow, and not in her and her son, as joint tenants.

Thomas Thweat testified that Daniel Duffey requested him to advise his son Ebenezer, to make him a deed to the land; that his object was to secure a home for himself during his life, and that he did not intend to take the land from the family or wife of his son; that he wished to live in the house with them, and that he intended the land for them after his death.

William C. Osborne swears, that Daniel Duffey, after taking possession of the land, informed him that his object in taking titles, was to prevent his son from deeding the land to James Smith and Seaborn Jones, his lawyers in the State case. "The promise upon which he procured the deed, was that he, Daniel, would retain the property while he lived, and that at his death it should accrue to, and become the property of Ebenezer's wife."

I would ask, does the bill or the evidence, set forth the true agreement? And which portion of the testimony? For it will be perceived that the witnesses are not only at variance with the bill but with one another. No decree, we respectfully contend, could be rendered under such circumstances.

How forcibly and triumphantly does this conflict and confusion of recollection vindicate the value and policy of the Statute.

Eleanor Downing, whose intimacy in these families, gave her every facility for knowing the truth of the matters about which she speaks, testifies that Daniel Duffey gave to his son, Ebenezer, four negroes, and other necessary things for house-keeping—that she frequently heard Ebenezer say, that his father had paid his lawyers for defending him against the prosecution for murder, and *that he had paid for the land in dispute.* That he got nothing by his wife, except a cow and calf, and a little household furniture. That all he had, his father gave him. And yet, under these circumstances, some loose declarations of the old gentleman's, are seized upon as to his intentions respecting this property, and the attempt is made to deduce from them a technical trust. To do so, in the language of Chancellor Kent, "would be injurious to that freedom of intercourse, and to the operation

of those kind and generous affections, which ought to be cherished in the circle of the domestic affections."

[5.] But there is one other point in this case, which it may be well enough to notice.

Daniel Duffey, by his will, devised the land in controversy to his son Jesse Duffey. To Mrs. Caroline Cotten, the complainant, he bequeathed fifty dollars. To his grand-son, John W. Duffey, the son of Ebenezer, he gave six thousand dollars. There is a codicil to the will, to this effect, " that whereas Caroline Cotten, the mother of John W. Duffey, had in her possession three negroes, that is, Jack, full grown, and Solomon and Weston, boys, on which negroes the said John W. Duffey has a legal claim— therefore it is my will that if my grand-son should urge his claim on the said negroes, that then, and in that case or event, his mother, Caroline Cotten, shall receive eight hundred dollars out of the legacy bequeathed to the said John W. Duffey. And if the said John W. Duffey shall die before he arrives at lawful age, his mother shall have one thousand dollars out of his legacy."

The testimony shows that the guardian of John W. Duffey, has received the legacy left to him. Also, that Stephen G. Cotten, and Catharine, his wife, have joined in a sale, to Wm. A. Norwood, of Solomon, one of the negroes named in the codicil, for the sum of five hundred and fifty dollars. Moreover, they have been paid in executing to the purchaser a written guaranty, which, after reciting the cloud hanging over the title of the slave, gives him a lien on the contingent legacy of $800, or so much of it as may be necessary for his indemnity, should John W. Duffey ever recover said negro from him.

It is insisted on the part of the defendants, that the complainants having taken a benefit under the will of Daniel Duffey, they cannot recover this land against the provisions of said will. His Honor, the presiding Judge, instructed the jury, " that in order to create a case of election, there must be a gift of something *which belongs to the testator*, to a person whose property he has by the same will given to another. That Daniel Duffey did not set up any claim to the negroes, named in the codicil. He only says that if John W. Duffey should urge his claim to the negroes therein mentioned, then he shall forfeit to his mother, Catherine Cotten, eight hundred of the six thousand dollar legacy left

him, and that, consequently, the codicil to the will did not make a case of election, as to Mrs. Cotten."

We apprehend that the doctrine of election is too much restricted in this charge. It is thus stated by *Jarman on Wills*, "he who accepts a benefit under a deed or will, must adopt the whole contents of the instrument, conforming to all its provisions, and renouncing any right inconsistent with it. If, therefore, a testator has affected to dispose of property not his own, and has given a benefit to the person to whom that property belongs, the devisee or legatee accepting the benefit so given to him, must make good the testator's attempted disposition; but if, on the contrary, he choose to enforce his proprietary rights against the testator's disposition, Equity will sequester the property given to him, for the purpose of making satisfaction out of it, to the person whom he has disappointed by the assertion of those rights." 1 *Vol. p.* 385.

Thus, it will be seen that if the testator has affected to dispose of property not his own, the only inquiry is, has he given a benefit to the person to whom that property belongs, and has the legatee or devisee accepted the benefit so given? To apply the doctrine: admitting that Daniel Duffey has devised to his son Jesse, a tract of land belonging to Mrs. Cotten, has he by his will bestowed a benefit on Mrs. Cotten, and has she accepted that benefit? The sale to Norwood and the indemnity given for his security through the codicil to the will, place this matter beyond controversy. It is wholly immaterial whether Daniel Duffey owned the slaves named in the codicil or not; neither is it necessary that he should have attempted to bequeath them. It is enough to know, by the terms of the codicil, that he has secured to Mrs. Cotten, the title to Solomon, Jack and Weston, against the claim of his son; or in the event of its assertion that he has given to her $800 to cover the loss. By reason of this provision, she has been enabled, in concert with her husband, to effect a satisfactory sale of one of the negroes. A benefit has, therefore, been conferred by the testator, and she has accepted that benefit. She is bound by her election, and must make good the testator's disposition of the land to Jesse Duffey. In judgment of law, she has adopted the whole contents of Daniel Duffey's will.

Defendant's solicitor requested the Court to charge the jury that if they believed, from the testimony, that Daniel Duffey had

advanced money for Ebenezer G. Duffey, to defray the expenses of his trial, or on any other of the transactions stated in the complainant's bill, and which does not appear by the evidence to have been refunded, that they should not decree a re-conveyance of the premises, without requiring said sum or sums, with interest, to be refunded by complainant; which instructions the Court declined to give, because no defence of this sort was set up in defendant's answer; and that even if it had been, the Judge charged the jury, that it would be a good defence only to an action brought by an administrator on the estate of Ebenezer G. Duffey.

[6.] While it is true that in cases of fraud, whether constructive or actual, Courts of Equity have adopted principles extremely broad and comprehensive in the application of their remedial justice, and especially where there is any fraud affecting the acquisition of property, will they interfere and administer a wholesome justice, and sometimes even a stern justice, in favor of innocent persons, who are sufferers by it, without any fault on their own side. *Hill on Trustees,* 144. Still relief will only be given in these cases, upon the terms of returning any considera tion that may have been received. 11 *Ves.* 535. Whenever any benefit has been received, the Court will usually fasten a trust on the conscience of the party in respect of such receipts, and direct an account and re-payment. 2 *Vernon,* 392. *Ambler,* 432. In this last case, Lord Chancellor Henley expressed himself very strongly. He said he had not the least doubt as to the principle; and that, "if there was no precedent for the determination which he should make, that he had no scruples to make one, and should glory in doing it."

We are inclined to think that there was nothing in the pleadings, which prevented the party from availing himself of the benefit of this rule. It would be involved in the bill itself, provided a proper case was made. We are of the opinion, however, that the account and repayment, is restricted to matters arising out of the particular transaction. If money was advanced by Daniel Duffey, on account of this land, or if the title was executed by way of security, then it was proper that repayment should be made before Equity would decree a reconveyance. As to any general indebtedness by Ebenezer to his father, as was suggested by the Court, that was a matter to be

adjusted by the legal representative of the estate, and not by the complainants.

Our conclusion is, that the ruling of the Circuit Court cannot be sustained. Consequently, the judgment below is reversed.