RHEA, *Administrator, et al v.* PURYEAR, *et al.*

ADMINISTRATORS—*Parties to Suits.*—When there is no allegation of indebtedness against a deceased person's estate, or that the administration had not been closed, and the record discloses no interest favorable or adverse of any of the defendants in the assets of the estate; and no grounds upon which they might be liable in another suit, it is not necessary that the administrator be made a party.

AGENT—*Fraudulent acts of.*—It is fraud on the part of an agent entrusted with money for a specific purpose, to attempt to control such means for his own benefit, and in his own name, and any profit or advantage resulting therefrom, reverts in equity to the principal.

A party purchasing lands with his own money, under an agreement that such purchase should be made, will not be permitted to hold them against the beneficiary.

MISTAKES—*Corrected after cause submitted.*—Discovery of mistake in the number of lands after a cause is submitted for final hearing, may be corrected.

*Appeal from Randolph Circuit Court.*

HON. L. B. MACK, Circuit Judge.

*Byers & Cox,* for appellant.

We submit that the court erred in permitting the bill to be amended after the cause was submitted, so as to make the allegations correspond with the proof. *Shields v. Barron, 17 How. U. S. R. 144. Patterson v. Fowler, Ex'r., 23 Ark. 470.* No facts are in issue unless charged in the bill, and no proof can be offered or relief granted for facts not charged in the bill. *Story's Eqt. R. sec. 257; Crocket v. Lee, 7 Wheaton 522; Jackson v. Ashton, 11 Peters 229; James v. McKendre, 6 John. 564; 1 Daniel P. C. & Pr. P. 377 and note 2.* The only prayer in the bill is for specific relief, in such case no other relief can be granted. *1 Dan'l P. C. & pr. p. 376; notes 1, 2, 3 and 4* and authorities there referred to.

The complainant's part of the agreement, set up in the bill, has not been performed and cannot be secured, and hence, there is a want of mutuality. *Adam's Eqt. p. 237 and note 2, and authorities there referred to; Shields v. Trammel, 19 Ark. 51; McNeil v. Janes, 21 Ark. 277.* The contract was in parol and there was no such part performance as would take the case out of the statute by frauds. *Adam's Eqt. p. 247, 86, note 1; Baker v. Hauldbraugh 15 Ark. 322; Keats v. Rector, 1 Ark. 139; Underhill v. Allen 18 Ark. 466; Johnson v. Craig, 21 Ark. 533.*

Gregg, J.

On the 18th of April, 1859, the appellees filed their bill, in chancery, in the Randolph circuit court, in which they alleged that Seymour Puryear, in the fall of 1852, furnished John Rhea with $102, and employed him to go to the United States land office at Batesville, Arkansas, and enter for him the south half of the south-east quarter of section 28, township 19, north of range 1 west; that he went, but instead of entering said eighty acres in the name of Puryear, he purchased a land warrant, and entered the whole of said quarter section in his own name, and represented to Puryear that the quarter section had not been divided, and he was compelled to enter the whole,

but if he wanted it, upon the payment ·of the balance of the purchase money, he would deed the whole to him, which sum Puryear proposed to pay as soon as he became able to do so.

It is further alleged that Seymour Puryear was in possession of said lands, and so continued up to his death, and that his administrator and heirs remained in possession for about one year thereafter, and that said Rhea promised that he would make title to complainant, but when the remainder of the purchase money was tendered, he refused, and that in the month of January, 1857, he died, leaving the defendants his heirs.

Complainants pray that the defendants be required to make them title to said land; that they specifically perform said contract, and for general relief.

At the May term, 1859, complainants obtained leave to amend their bill, as to the names of some of the defendants; a guardian *ad litem*, was appointed, and an answer filed for a minor, and the cause continued. At the next November term the other defendants filed their joint answers, to which answers replications were entered, and the cause set for hearing, with leave to take depositions generally.

At the May term, 1860, depositions were published, a suggestion made of the loss of the defendant's answer, a rule made upon the clerk to produce it, and an order made that a substitute be filed, in case the same is not produced by the next term; at which time the administrator filed a substitute answer, and the cause, by consent, was continued.

At the November term, 1865, the parties, by solicitors, appeared, and the cause was continued; and at the May term, 1866, it was suggested that the minor had arrived at full age; her answer was put in and replied to, other necessary changes in parties made, and another order to continue and take depositions. At the next term a similar order was made. At the May term, 1867, depositions were published, and again continued, with leave to take depositions generally.

The defendants answer that they are the representatives and heirs of John Rhea, and that the complainants are the heirs

of Seymour Puryear; that Rhea entered the lands described in the bill at the time therein stated, and that the parties died about the times stated; but they deny that any part of the lands were entered with Puryear's money, or for his use, and insist the same were entered with Rhea's own money, and for his own use; and they deny that the same was ever in the possession of said Puryear, or his heirs—the complainants.

At the November term, 1867, the cause was submitted to the court for final determination; and after the same was so submitted, it appeared there was a variance in the description of the land, between the allegations in the bill and the proofs submitted; and the solicitors for the complainants moved the court to allow them to amend their bill, by changing the numbers of the lands in the bill to correspond with the numbers in the depositions, to which the defendants objected; but the court overruled their objections, allowed such amendments to be made in the bill; and ordered that the defendants amend their answers; that new issues be formed, and that the cause be again set down for final hearing at the next term, and that leave be granted to the parties to take depositions generally; and that the complainants pay all costs accrued subsequent to the May term, 1860. To all of which the defendants excepted. The numbers of the lands in the bill were slightly changed, and at the May term, 1868, the cause was submitted on the original issues.

And, notwithstanding the great number of continuances, and rules to take depositions, the only ones brought before the court were those of Davis, Hoffstetler and Carter.

Davis testifies that he was at Rhea's; Puryear came there, and he heard him say to Rhea: "I have understood you are not going to make me title to my land," (referring to the land where he resided.) Rhea assured him that he would whenever he paid the purchase money and interest; said he would give bond for title, and if he died, his family would make title, and if he lived, he would make title to-morrow, next

day, or any time thereafter, when the money and interest were presented.

Hoffstetler testifies that he was with Rhea when he entered the south half of the southeast quarter of section twenty-eight, township nineteen, north of range one west, for Puryear; he thinks Puryear put $102 into Rhea's hands for that purpose; Rhea said he could "not save it without taking the whole quarter;" said he did not know how Puryear would like it, but he was going to save it in his own name, to keep himself safe for his eighty-acre warrant that he had bought. When the parties met, Rhea told Puryear how he had done, and inquired if he wanted the whole quarter; he responded he did; Rhea told him that as soon as he would pay him back the money he had had to pay out for the land warrant, and interest on his money, he would make him title; Puryear agreed to repay the money as soon as he could. Rhea, at the time, said Puryear had employed him to go and save the land for him; Rhea always appeared willing to make the title when repaid; Puryear had part of the lands inclosed and in cultivation, and Rhea permitted him to retain possession as long as he lived.

Carter testifies that he knew the parties deceased in life; that in 1852 or 1853, Puryear employed Rhea to go to Batesville to enter the south half of the southeast quarter of section twenty-eight, in township nineteen, north of range one west, and that he gave him the money to make the entry with; that himself and one Harvey loaned Puryear $102 in money, with which to have the entry made, and it was agreed Rhea should so expend that money; afterwards, at Batesville, Rhea said he could not enter that eighty acres without entering the whole quarter, and that he had given Wash. Hunter his note for an eighty-dollar land warrant, and with that and Puryear's money, he had entered the whole quarter; that he had entered in his own name, and did not know how Puryear would like it; that the land was worth the money, and if Puryear did not like it, he would pay him back his money and

keep the land, but if he wanted it, he could have it by paying him the money he was out; that he would make title whenever Puryear paid him the eighty dollars and interest; Puryear had some of the land in cultivation; Rhea permitted him to remain in possession of it up to his death, and his heirs held it for some time thereafter; Rhea died about three years after Puryear; does not know that Puryear ever tendered Rhea the eighty dollars.

Upon the proof, the court found in favor of the complainant, as to the south half of the southeast quarter of section twenty-eight, township nineteen north, range one west, and that Rhea was the agent of Puryear in entering said land; that the same was entered with Puryear's money, and of right belonged to him; that the north half of said quarter was entered by Rhea, and of right belonged to him, and the court decreed that no relief be granted as to said north half of said quarter section, and that said defendants be divested of all right and title to the south half of said quarter section; that the same pass to and vest in said complainants, and that the defendants pay all costs not before decreed; from which decree the defendants appealed.

It is here urged that the court below erred in not finding in favor of the demurrer clause in the answer, because the administrator of Puryear was not a party.

It was also urged as grounds of demurrer that the bill was brought for a specific performance of a contract resting in parol; that no part was performed; that the complainants did not gain possession under it; did not pay the purchase money; did not make valuable improvements, and that the contract was within the statute of frauds, and the court should have so found; that the court should have found that there was no equity in the bill.

It is also urged that the court erred in declaring a resulting trust when the bill does not claim such relief, and that likewise the court erred in allowing complainants to amend their bill

after the cause had been submitted to the court for final determination.

Should the court have found against the complainants, upon the demurrer clause in the defendants' answer alleging that Carter, as administrator, was not made a party complainant? We think not. We see no possible ground upon which the defendants in this suit could have been prejudiced for want of such party to the bill. There is no allegation of indebtedness against Puryear's estate, or that the administration had not been closed. The record discloses no interests, favorable or adverse, of any of the defendants in the assets of that estate, and no grounds upon which they might be liable in another suit. And, upon a careful examination of the bill, we find no admission that Carter or any one else was an administrator of Puryear's estate at or after the bringing of this suit. The bill states that during the year next after the death of Puryear, John Carter, as administrator, and the heirs of Puryear possessed the lands.

Puryear died in 1852; the statute law required the administration to close within two years, unless for good cause, the court of probate should extend the time for final settlement; then, if he was administrator in 1853, it was his duty to have closed that administration in 1855, and the presumption would certainly be rash and against law to suppose such administration continued until the 18th of April, 1859, nearly seven years, at which time this suit was commenced. Then it is assumed that there was an administrator, (with no allegations to that effect), and so far as we can see, no necessity for the appointment of one.

We can not see the force of the next and principal ground urged against the complainants' recovery. This was not a sale and proposed transfer of lands, as contemplated by the statute, to prevent frauds, etc., which requires real estate contracts to be in writing, or the payment made or certain performance done before relief can be had.

The ground here assumed, and I may say established, is that

Rhea was the agent of Puryear, employed to invest Puryear's money in specific property, and for Puryear's use, being thus intrusted it was a fraud on his part to attempt to control such means for his own benefit or in his own name, and all profit or advantage resulting therefrom would certainly in equity inure to Puryear; and these facts appearing in the bill and proofs were sufficient to sustain a decree without any express words declaring that a resulting trust existed in favor of Puryear's heirs. Some courts go further and declare that acts fraudulent in themselves are overridden by the statute. ·

In *Miller et al. v. Colton et al.*, the Supreme Court of Georgia say: "We fully recognize the doctrine that a court of equity will not permit the statute of frauds to be set up as a defense, by a party infected with fraud, and that parol trusts in real estate may be established in direct contradiction to the statute on the ground of fraud." *5 Ga., 346.*

In many cases, even where parties purchased real estate with their own money, the courts have holden that it would be a fraud to allow them to hold the lands against those beneficially interested, and for whom it had been agreed such purchases should be made. *Jones v. Hubbard, 6 Munford, 263; Davis et al. v. Hopkins, 15 Ill., 522; Miller v. Thomas, 14 Ill.; Trapnall v. Brown, 19 Ark., 39; Pyatt v. Oliver et al., 2 McLean, C. C. R. 267; Furguson et al. v. Williams et al., 20 Ark., 272; Cain v. Leslie, 15 Ark., 312.*

In the last case, by agreement, Leslie, with his own money, entered lands, including Cain's improvements, and afterwards refused to convey to Cain, but conveyed one-half to others, who it was alleged connived with Leslie to obtain the lands. Chief Justice WATKINS said: "It seems to be clearly a case where, unless the agreement be performed, an unconscionable fraud and deceit will have been practiced upon the complainant."

Finally, we are asked to reverse this decree because the complainants were permitted to amend their bill upon a discovery of a mistake in the numbers of the land, after the cause was

submitted for final hearing.   An objection like that ought not to be tolerated on the law side of a court, and in equity, where an enlarged discretion should always be exercised to meet the ends of substantial justice, such exceptions become frivolous.

The Chancellor below gave the defendants until the next term to amend their answers, ordered the issues to be formed anew, again set the case down for hearing, and granted the parties further leave to take depositions; and then taxed complainants, because of their oversight, with the costs of five terms of the court.   To have granted the appellants more would have outraged justice upon a pretense of doing equity.

Upon the record we find no error prejudicial to the appellants.

The decree is affirmed.