WASHBURN et al. v. GILLESPIE.

(Circuit Court of Appeals, Eighth Circuit. September 22, 1919. Rehearing Denied January 10, 1920.)

No. 5238.

1. EVIDENCE ⬅303(1)—PAROL EVIDENCE INADMISSIBLE IN ABSENCE OF MISTAKE OR FRAUD.

A written oil and gas lease cannot be varied by parol evidence, unless mutual mistake or fraud be present.

2. MINES AND MINERALS ⬅78(2)—RIGHT TO FORFEITURE OF OIL AND GAS LEASE.

Where the lessee under an oil and gas lease agreed to complete a well within one year, or pay at the rate of $40 for each additional three months completion should be delayed from the time fixed, the lease cannot be forfeited because the lessee made no effort to start drilling a well until the year had nearly expired.

3. MINES AND MINERALS ⬅79(3)—FORFEITURE OF OIL AND GAS LEASE FOR NONPAYMENT OF RENTALS.

Where payment of first quarter's rent due under oil and gas lease was tendered before it was due, and there was no requirement in the lease for payment in advance, the lease cannot be forfeited because tender for a subsequent quarter was not made until after the quarter began.

4. COURTS ⬅359—FEDERAL COURTS SHOULD FOLLOW LOCAL LAW AS TO VALIDITY OF GAS LEASES.

The federal courts should follow the local law in determining the validity of oil and gas leases.

5. MINES AND MINERALS ⬅58—OIL AND GAS LEASE NON-UNILATERAL.

Provision in an oil and gas lease, allowing the lessee on payment of $1 to surrender the lease for cancellation, does not render the lease unilateral, so as to give the lessor a right of cancellation.

6. EQUITY ⬅65(3)—RIGHTS OF LESSEE UNDER OIL AND GAS LEASE.

Though oil and gas lease provided that the lessee should complete a well within one year or pay stipulated sum for each three months period completion was delayed, held that, where the lessee knew a test well was being sunk in that field by another, and encouraged the work by assigning a nearby lease, the lessee's delay in beginning drilling until the test well was completed did not deprive him of the right to proceed under the lease and to have interference with drilling enjoined on the theory that he did not come into court with clean hands.

7. SPECIFIC PERFORMANCE ⬅51—INJUNCTION AGAINST INTERFERENCE WITH OIL AND GAS LEASE.

An oil and gas lease on a royalty basis held not so unfair as to deprive the lessee of the right to an injunction preventing the lessor from interfering with drilling, on the ground that the suit was in essence one for specific performance.

Appeal from the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Suit by E. N. Gillespie against Jesse C. Washburn and others. From a decree for complainant, defendants appeal. Affirmed.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Horace Speed, of Tulsa, Okl., and Henry S. Johnston, of Perry, Okl. (Johnston, Robinson & Rice, of Perry, Okl., on the brief), for appellants.

C. B. Ames, of Oklahoma City, Okl., and A. Mitchell Palmer, of Stroudsburg, Pa. (William A. Sipe, Jr., of Tulsa, Okl., Mr. Robert J. Dodds and Reed, Smith, Shaw & Beal, all of Pittsburgh, Pa., and Ames, Chambers, Lowe & Richardson, of Oklahoma City, Okl., on the brief), for appellee.

Before HOOK and STONE, Circuit Judges, and MUNGER, District Judge.

STONE, Circuit Judge. Appeal by defendants from decree in favor of lessee (Gillespie), enjoining lessors from preventing or interfering with drilling for oil and gas on land owned by lessors and covered by an oil and gas lease to Gillespie, dated September 24, 1915, set out in the margin.[1] At the time this lease was executed the parties executed a supplemental contract as follows:

"Know all men by these presents: That, whereas, on the 24th day of September, 1915, Jesse C. Washburn and Anna M. Washburn, his wife, of

---

[1] Agreement, made and entered into the twenty-fourth day of September, A. D. 1915, by and between Jesse C. Washburn and Anna M. Washburn, his wife, of Billings, Oklahoma, parties of the first part, lessors, and E. N. Gillespie, of Freeport Penn., party of the second part, lessee,

Witnesseth, that the said parties of the first part for and in consideration of the sum of $1.00 to them in hand well and truly paid by the said parties of the second part, the receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of the second party to be paid, kept and performed, have granted, demised, leased and let and by these presents do grant, demise, lease and let unto the said second parties, his heirs, executors, administrators, successors or assigns, for the sole and only purpose of mining and operating for oil and gas, and of laying pipe lines and of building tanks, powers, stations and structures thereon to produce and take care of said products, all that certain tract of land situate in the county of Noble, state of Oklahoma, described as follows; to wit: The northwest quarter (N. W. ¼) of section fifteen (15), township twenty-three (23) north, range two (2) west, containing 160 acres more or less.

It is agreed that this lease shall remain in force for a term of five years from this date and as long thereafter as oil and gas or either of them is produced from said lands by the party of the second part, heirs, administrators, executors, successors or assigns. In consideration of the premises said party of the second part covenants and agrees:

1st. To deliver to the credit of the first parties, their heirs, or assigns, free of cost in the pipe line to which it may connect its wells, the equal one-eighth (⅛) part of all oil produced and saved from the leased premises.

2d. To pay the first parties at the rate of one hundred and fifty dollars each year in advance for the gas from each well where gas only is found, while the same is being used off the premises, the first parties to have gas free of cost from any such well for all stoves and all inside lights in the principle dwelling house on said land during the same time, by making their own connections with the well.

3d. To pay the first parties for gas produced from any oil well and used off the premises at the rate of twenty-five dollars per year, for the time during which such gas shall be used, said payments to be made each three months in advance.

The party of the second part agrees to complete a well on said premises within one year from the date hereof, or pay at the rate of forty dollars for

Billings, Okl., signed, sealed and delivered to E. C. Funk, of Tulsa, Okl., an oil and gas lease covering 160 acres of land described as the northwest quarter of section 15, township 23 north, range 2 west, Noble county, Oklahoma: Therefore it is hereby expressly agreed by and between the parties hereto that if the party of the second part fails within 90 days to secure sufficient acreage to warrant operations that the party of the second part shall return this lease, thereby relieving and surrendering all rights, title and interest thereto."

The issues here are whether or not (1) the supplemental contract as executed represents the actual agreement; (2) Gillespie failed to perform, giving right of rescission which was exercised by appellants; (3) the appellants could or did terminate the lease through the so-called "surrender" clause thereof; and (4) the evidence shows lack of equity in that Gillespie comes with unclean hands to enforce an unfair lease.

[1] As to the first contention, appellants claim that the supplemental contract, as written and signed, does not express the agreement actually made, and that as expressed it is ambiguous. A reading of the writing reveals no uncertainty as to its meaning, which is that this lease was to be canceled unless within 90 days from its date Gillespie secured sufficient acreage in that field to warrant operation. Appel-

---

each additional three months, such completion is delayed from the time above mentioned for the full completion of such well until a well is completed; and it is agreed that the completion of such well shall be and operate as a full liquidation of all rent under this provision during the remainder of the term of this lease.

The party of the second part shall have the right to use, free of cost, gas, oil and water produced on said land, for its operations thereon, except water from wells of first party.

When requested by first party the second party shall bury its pipe lines below plow depth.

No well shall be drilled nearer than 200 feet to the house or barn on said premises.

Second party shall pay for damages caused by drilling to growing crops on said land.

The party of the second part shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing.

The party of the second part shall not be bound by any change of ownership of said land until duly notified of any such change, either by notice in writing duly signed by the parties to the instrument of conveyance, or by receipt of the original instrument of conveyance, or a duly certified copy thereof.

All payments which may fall due under this lease may be made directly to Jesse C. Washburn of Billings, Okl., or deposited to his credit in the Billings State Bank, of Billings, Okl.

The party of the second part, its successors or assigns, shall have the right at any time on the payment of one dollar to the party of the first part, their heirs or assigns, to surrender this lease for cancellation, after which all payments and liabilities thereafter to accrue under and by virtue of its terms shall cease and determine: Provided this surrender clause and the option therein reserved to the lessee shall cease and become absolutely inoperative immediately and concurrently with the institution of any suit in any court of law or equity by the lessee to enforce this lease or any of its terms, or to recover possession of the leased land or any part thereof, against or from the lessors, their heirs, executors, administrators, successors or assigns or any other person or persons. All covenants and agreements herein set forth between the parties hereto shall extend to their successors, heirs, executors, administrators or assigns.

lants say that the agreement as it was really made and should have been written was that a well should be commenced on this leasehold within 90 days. The contract was drawn by Gillespie's agent, in the presence of the notary and Washburn, and possibly of Mrs. Washburn, who was in and out of the room during the visit of the agent. It was then read by the agent to Washburn, and possibly Mrs. Washburn, in the presence of the notary. It was then signed by the agent and the Washburns and witnessed by the notary, after which it was given to Washburn and retained by him. The agent kept no copy. To explain their signing the contract as written, the Washburns claim that the agent either mistakenly or fraudulently misread it to them, so that they thought it expressed the agreement as claimed by them. Gillespie contends that the clear written contract cannot be varied by parol evidence. This is true, unless mutual mistake or fraud be present. A careful study of the entire evidence convinces that the contract was read as written and that there was neither mistake nor fraud.

[2, 3] The contention of nonperformance is based upon the claim that no well was drilled within the first year, nor were the rental payments promptly made, as required by the lease as follows:

"The party of the second part agrees to complete a well on said premises within one year from the date hereof, or pay at the rate of forty dollars for each additional three months, such completion is delayed from the time above mentioned for the full completion of such well until a well is completed; and it is agreed that the completion of such well shall be and operate as a full liquidation of all rent under this provision during the remainder of the term of this lease."

The facts are that nothing was done toward drilling a well on this leasehold until the last day of the first year, when Gillespie brought to the land a load of rig material and was denied admittance by Washburn. The rental payment for the first quarter, which began September 24, 1916, was tendered August 22, 1916, and refused, and thereafter placed in the bank named in the lease as depository, where it remained. January 3, 1917, the tender for the second quarter, which began December 24, 1916, was made and refused. The only objection touching the rentals is that the second tender was overdue 9 or 10 days. This is based on the theory that the lease required the quarterly payments to be in advance, which would make this payment due December 23, 1916. There is no such requirement in the lease. The contention as to the failure to drill the well is that there must be a bona fide effort to complete one during the first year. A similar contention was urged in Guffey v. Smith, 237 U. S. 101, 105, 116, 35 Sup. Ct. 526, 59 L. Ed. 856, and disapproved.

[4, 5] The third contention is that the surrender clause of the lease, which gives the lessee the right to surrender and terminate the lease at any time, on the payment of $1, makes the lease so unilateral as to give the lessors a right of cancellation which they exercised. The validity and interpretation of this character of surrender clause has been before the courts on several occasions. Guffey v. Smith, 237 U. S. 101, 113, 35 Sup. Ct. 526, 59 L. Ed. 856, settles the law that this is a kind of question which should be settled by the local law, in so far

as it affects the validity of the lease. The latest expressions of th' Oklahoma Supreme Court favor the validity of such provisions. Northwestern Oil & Gas Co. v. Branine (Okl.) 175 Pac. 533; Rich v. Doneghey (Okl.) 177 Pac. 86. It is true that these two cases were decided after this case was tried below, and that up to that time the Oklahoma Supreme Court had taken the contrary view. The evidence here shows that a large percentage of the oil and gas leases in Oklahoma, covering millions of acres of land, contain this or similar clauses. There should not be opposed rules of property affecting so many persons and so much property within the same state. These leases should all be valid, or all be invalid, no matter whether they be tested in state or federal courts. Harmony and absence of confusion are desirable. Guided by this pressing need of harmony in decision, by the consideration that this is the character of question where the state courts would be unhesitatingly followed were there no difference in such decisions, by our own view that this clause should be held valid, and by the view, expressed by the Supreme Court concerning such a surrender clause, that "it is difficult to perceive how it could be declared inequitable" (Guffey v. Smith, 237 U. S. 101, 117, 35 Sup. Ct. 526, 59 L. Ed. 856), we shall follow these last decisions of the Oklahoma Supreme Court declaring the surrender clause valid and as applicable to the lessee alone.

[6] The claim that Gillespie comes with unclean hands is unfounded. This is based on the statement that he knowingly procured a number of leases in the vicinity, by giving and fostering the impression among the lessors that he would forthwith begin drilling on the leaseholds, and that the leases required him so to do, while he had held the leases without drilling, waiting for developments by third parties to determine whether it would be profitable for him to drill. We are not here concerned with what may have been told other lessors by Gillespie's agent, and, if we were, we doubt if mere statements of intentions to drill forthwith, though made to Washburn, should stop a court of equity. Besides, Gillespie seems to have acted reasonably in this regard. The territory was entirely undeveloped, with no facilities for caring for oil or gas, if found. A test well would not only tend to develop the presence of gas and oil, but would give information very valuable in furthering drilling, since it would reveal the character of formation and necessary depth, thus determining the kind of rigging and size of hole and of casing best suitable. It was the part of wisdom for all operators in this untried field to ascertain these facts. Before he had secured all of the leases in his "block" Gillespie had learned of a well to be sunk by the Mid-Co Company, and actively encouraged that test hole by agreeing to, and subsequently assigning, a nearby lease. The contract with the Mid-Co for this well was dated November 19, 1915, the well begun January 18, 1916, and pushed to completion, showing valuable oil and gas August 17, 1916. In a little more than a month afterwards Gillespie was endeavoring to erect drill rigs on this and other leases held by him. The testimony shows that he is an operator on a large scale, and not a speculator in leases. There is

no evidence that he did not intend to develop the land, and the delay was natural and sensible, under the circumstances.

[7] It is urged that this suit is in essence an action for specific performance of the lease and that the contract is so unfair that the court should not compel its performance. We cannot agree with this contention as to the contract. The expressions of the Supreme Court in Guffey v. Smith, 237 U. S. 101, 115, 116, 35 Sup. Ct. 526, 59 L. Ed. 856, are applicable to this case, although that was not a case of specific performance.

The decree is affirmed.