## Duff v. May et al.

(Decided May 3, 1932.)

GRANNIS BACH and W. L. KASH for appellant.

E. C. HYDEN and WILLIAMS & ALLEN, and C. C. TURNER for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

The paper offered for probate as the will of Mrs. Elizabeth Akeman provides for the payment of her debts, the erection of a monument, and bequeaths certain articles of bed clothing to a nephew and the rest of her estate to Ira J. Duff, who was not related to her. The judge of the county court, a nephew by marriage of the deceased, refused to probate the will, and an appeal was taken to the circuit court. The deceased's heirs were five brothers and sisters and a number of nieces and nephews, some of whom successfully prosecuted a contest in the circuit court. This appeal is by Duff, the devisee, from the judgment declaring the document not to be Mrs. Akeman's will.

In the approach to the consideration of the facts of the case, it may be well to recall certain fundamental rights and powers. One may dispose of his property as he desires, and it is not for the jury to set aside his will because the disposition of the property was not what its members would have made. The jury is to determine in the matter of mental capacity only whether the testatrix has sufficient mind and memory to know the character and value of his estate, to make a rational survey thereof, to know the natural objects of his bounty and his obligations to them, and to dispose of his property according to a fixed purpose of his own. When a verdict has been rendered and judgment entered thereon and the case is before this court for re-

view, as concerns the quantum of proof on the issues raised by the pleadings, we are confined in the first instance to the question whether there was a scintilla of evidence warranting the submission of those issues. Such standard of measurement means that there must be evidence of something of substantial and relevant consequence, carrying the quality of proof and having fitness to induce conviction, and not vague, uncertain, and irrelevant matter, giving rise to a chimerical probability. Poll v. Patterson, 178 Ky. 22, 198 S. W. 567; Burdon v. Burdon's Adm'x, 225 Ky. 480, 9 S. W. (2d) 220. Finally, if that quality and degree of evidence is found to have been adduced, we are to determine whether the verdict is flagrantly against the evidence, as that phrase has been often defined.

Before 1917, Mrs. Akeman and her husband had lived on a mountain farm in Breathitt county about twenty miles from the county seat. In that year, when the railroad came into their community, they sold the place for $10,000 and moved to Jackson. With a part of the proceeds they purchased a cottage and placed the rest on time deposit in a local bank. The husband died in 1920 and devised all of his property to his widow. She lived alone until her death in June, 1929, aged about seventy years.

The propounders of the will showed that, while in a hospital in Jackson, she requested her physician, Dr. Wilgus Bach, upon more than one occasion to have an attorney come and write her will. The attorney, Grannis Bach, went to see her and learned her wishes. He prepared the will at his office and at her request returned to the hospital with Ben Sewell, cashier of the bank where Mrs. Akeman kept her funds. She was able to walk about her room, and after the will was read to her she duly signed it in the presence of her doctor, lawyer, and banker, who witnessed it. This was August 14, 1926, which date appears on the document. These three men testified unequivocally to her testamentary capacity. She asked that nothing be said about the will and requested Mr. Sewell to keep it for her. Later she asked him if he was keeping it safely.

We first state the substance of the evidence presented by contestants in opposition to the will. All the members of the family were always upon friendly terms with Mrs. Akeman, and some of them had waited upon

her and had been attentive to her needs. Some of these heirs owned no property. None of them were financially well off. The devisee, Duff, was a well-to-do merchant. While living in the country Mrs. Akeman had been very ill with typhoid fever, and thereafter her appearance, actions, and manner of talking changed, and this was more pronounced after another attack of that disease in 1922. She was sometimes forgetful and would ask the same question twice during a conversation. But the two or three specific instances related were insignificant. She is described by these witnesses —nearly all of them interested relatives—as being peculiar, independent, and "not a mixing woman." They expressed their opinions or decisions in their own minds, as one of them expressed it, that "she was on the decline and feeble in her mind." Some of them answered negatively the usual and formal question as to testamentary capacity. An intimate friend and church member testified that she was a sensible woman, but sometimes was "different." Since childhood she had known Mrs. Akeman and often called her "Aunt Elizabeth." One time she objected to being addressed by that term of affection, and at another time without cause, so far as the witness knew, she became offended at her teacher and quit going to Sunday School for several Sundays. It would not do to establish that as a test of insanity! The record is deficient as to the time of these conditions and incidents in relation to the date of the will.

Of more potency is the evidence of contestants as to the circumstances preceding and attending the execution of the will. Mrs. Akeman was afflicted with a cancer of the breast. Shortly before the will was made she was sent by Dr. Bach to Louisville for radium treatment. One of her brothers came in from the country to go with her. She told him that Ira Duff owed her a lot of money and the witness stated that he came in the day before they started to Louisville and paid her $350. They stayed in Louisville for eight or nine days while Mrs. Akeman was being treated by Dr. Wallace Frank. He came home with his sister on the train on Thursday, August 11th, according to his memory, and she was taken from the station to Dr. Bach's hospital, suffering a great deal. On the following Saturday this brother and another came to Jackson from their homes and on the way to the hospital met Dr. Bach who told them

that they could go to see her but she would not know them. They found her in bed in a stupor and she did not seem to recognize either of them. She called one of her brothers "Lee," although that was not his name. However, he sometimes had been mistaken for Lee Deaton. They saw neither Grannis Bach nor Ben Sewell there during the day. Both witnesses were positive that this was on Saturday next following her return from Louisville, and they say that according to their best recollection it was August 14, 1926, which was the date the will bore. A niece testified that she was brought home from Louisville on Wednesday, and the next day was in great pain and talked irrationally. Her uncles were there on the following Saturday, as was also the father of Ira J. Duff. It is not denied that this niece had been very kind and attentive to her aunt, not only during her illness, but upon many other occasions. Some days thereafter, having heard that a will favorable to Duff had been written, she looked up the calendar and found the Saturday next after her aunt had returned from Louisville and the day on which her uncles and Elijah Duff had been there to be August 14th. On the second Saturday after her return from Louisville, she testified, Mrs. Akeman's condition was a little worse. The witness was of the opinion that she did not have testamentary capacity at any time during the three weeks following her return.

It is to be noted that Mrs. Akeman lived nearly three years after this occasion. Some time after she left the hospital, upon inquiry by her brother, who had heard that she had made a will giving her property to Duff, she told him she had not done so; that she had not made a will or signed anything that would keep her people from getting her property. He testified, without objection, that the night his sister died, Dr. Bach told him he did not know anything about her having made a will, and, if he would have one fixed up, he would see that she signed it. Another brother asked her about it and she told him the only thing ever presented to her to sign while in the hospital, according to her recollection, was that along during the night Dr. Bach, Mr. Sewell, and Mr. Bach had presented her with a permit to sign which permitted her removal from the Louisville infirmary to the Jackson hospital, and that, unless she signed it, Mr. Bach could not draw his pay and keep her. A brother-in-law was also enough inter-

ested to ask Mrs. Akeman about the will and she told him she had made none and did not expect to do so; that she wanted her people to have whatever she had left. On an undisclosed occasion she told the husband of her husband's deceased sister that she wanted her property to go as Mr. Akeman had wanted it, and that there would be no trouble; told him not to be uneasy, that everything would be all right, and that her will was made to three young people. There was no medical or professional evidence presented in behalf of the contestants.

The description of the testatrix as given by a number of witnesses introduced by the contestee is epitomized in the testimony of one of her friends that "She was a plain, old fashioned woman; an intelligent old lady; a woman of few words; when she expressed herself it meant something." Dr. Bach stated that, although uneducated, she was intelligent and had "plenty of good horse sense." Her banker said she was capable of handling her business and was of good mind. Her frugality and economy are manifested by the fact that after nearly twelve years the proceeds of the sale of the farm remained practically undiminished. Many neighbors and friends testified as to her testamentary capacity.

The Akemans were childless. The principal beneficiary, Ira J. Duff, during his childhood and until they moved to Jackson, lived close to them in the country and was a favorite in their home. As a little fellow he stayed with them perhaps half his time, went on errands, and did the chores about the place. He stayed with the wife when the husband was away on the jury and for other purposes, and was his frequent companion in fishing and hunting. After they moved to town and he became a man he continued his interest in them and was a frequent caller at their home. They also visited in his home two or three times a year. The continuance of the testatrix' affection and a degree of dependence upon him are manifested by a number of letters written Duff and members of his family. In one of them, written in September, 1922, she says:

"Ira, I am depending on you to do something for me that I can't do for myself. If I call you or you hear of me being a corpse I want you to come to me at once and take me and bury me right by

husband, if you outlive me and I trust you will. You don't know what it is to have to live without a family friend. If I have luck I aim to make you safe in what you do for me. Ira, I ain't writing this to hurt your feelings, I want you to tell me if you will do what I have asked you to do and I can count on you."

In other letters she expressed her appreciation of what he had done for her and referred to the time he had stayed with her when a boy. It is in evidence also that she had expressed to several friends a purpose to give her property to him, and told them that she did not get along with some of her kin people and did not want them to have any of it. Mrs. Akeman had requested a neighbor that, if anything happened to her, she should call Duff and give him her keys, and left with this neighbor specific directions as to her burial clothing. Duff testified that he received a telegram from this neighbor and came to see her the day before she died. She gave him her pocketbook containing her certificate of deposit and told him to take it to the bank where he would find everything fixed for him. She thought she was going to die and asked him to make certain detailed arrangements for her burial. She had never told him that she had made a will but did state that she had fixed her papers and given him everything she had and had left the papers with Ben Sewell. Duff denies that he had ever owed Mrs. Akeman and denies the testimony of her brother that he paid her $350 just before she went to Louisville.

Of very material importance is the evidence that on August 4, 1922, Mrs. Akeman executed a will making exactly the same disposition of her property as that in the will of August 14, 1926. It had been written by a friend, M. S. Crain, a merchant in Jackson for many years, and the evidence shows it to have been duly signed by her in his presence and the presence of his brother. Crain testified, without objection, that Mr. Akeman had at different times stated that he and his wife had practically raised Ira Duff and he was going to will his property to her, and, if she outlived him, that they had an understanding that she would will it to Ira Duff. Such agreement is expressed in that will. At Mrs. Akeman's request Crain kept that will until he presented it in evidence on the trial. He moved to Lex-

ington in 1924. Contestants would destroy the effect of this paper by the argument that it shows Mrs. Akeman did not have memory enough to know that she had already made the same disposition of her estate when she signed the will under attack. Perhaps so. Still this manifests a purpose of long standing to do just what she did do. It may have been that, since Crain was not a lawyer, and had moved away from her home town, she thought the will might not be properly drawn and also that it might have been lost. It may be observed, parenthetically, that, should the present paper be ultimately rejected, this **will would become subject to** probate.

Dr. Wallace Frank, an eminent surgeon of Louisville, testified to having treated Mrs. Akeman with radium and as to its effect. She was under his care from July 30 to August 4, 1926. Other than a cancer on her breast she was in good physical condition for one of her age. He regarded her as a woman of ordinary intelligence and as having a clear mental condition. The doctor testified that, while cancer of the breast occasionally spreads to the brain, he detected no mental aberration and observed no symptoms of any disturbance of her mind because of the cancer. When she left Louisville for home she felt very bad, due, as he thought, to the reaction of the radium treatment.

Dr. Wilgus Bach, her physician in Jackson for many years, as we have stated, regarded Mrs. Akeman as having full testamentary capacity. She and her husband had discussed with him the disposition of their property. The old gentleman had expressed their continued affection for Ira Duff and related that as young people he and his wife had been very poor and sick; that Duff had come to their home and helped them and it was their purpose to give him their property. Mrs. Akeman talked with him about her family and family affairs. Her people were his good friends and he asked why she was not leaving any of her estate to them, and was told that none of them had ever done anything for her. She also related to him about the same thing as her husband concerning their relation with Ira Duff.

Dr. M. E. Hoge, of Jackson, testified in a general way as to the development and effect of a cancer. But he had not treated the patient and did not express an opinion as to her mental capacity, although it may be

deduced from his evidence, coupled with that of Dr. Frank as to the status of the cancer, that the disease had spread in the blood throughout her entire system.

Coming to the day of the execution of the will. It will be recalled that the contestants' evidence was that Mrs. Akeman returned from Louisville on Wednesday, Thursday, or Friday next preceding Saturday, August 14, 1926, and on the latter day that she was in a stupor and could not possibly have been qualified to make a will. There is no contradictory evidence as to Mrs. Akeman's condition on the Saturday following her return. But those witnesses are undoubtedly mistaken as to that day being August 14th. Dr. Frank's record and Dr. Bach's hospital record show that Mrs. Akeman returned from Louisville on August 4th. So the day that the other witnesses visited her and found her in a bad condition must certainly have been August 7th, and not the following Saturday, August 14th, on which day the will was executed. Except the statement of a niece that Mrs. Akeman was in bad shape for three weeks after her return, we have no contradiction of the evidence of the doctor, lawyer, and banker that on that day she was able to be up and about her room and that she possessed full mental vigor. She remained in the hospital on this occasion until October 24th. On June 2, 1929, she broke her hip and was brought to the hospital where she died June 14th, nearly three years after making the will.

Testimony of back dates based upon memory is not very trustworthy, while almost universal experience teaches that record entries made contemporaneously with a transaction are usually accurate. "Every consideration by which it is possible to establish the existence of a past event, by testing the accuracy of the evidence of it, is satisfied by such a record. It is less apt to be mistaken than the person who made it would be if testifying to it from memory subsequently." L. &. N. Railroad Company v. Daniel, 122 Ky. 256, 91 S. W. 691, 693, 28 Ky. Law Rep. 1146, 3 L. R. A. (N. S.) 1190; Gus Datillo Fruit Co. v. L. & N. R. R. Co., 238 Ky. 322, 37 S. W. (2d) 856. In Charles H. Conner & Co. v. Mason, 143 Ky. 635, 137 S. W. 235, the date that a letter bore was accepted by the court as the true date of a transaction rather than parol evidence based upon memory. An unimpeached writing is to be accepted under the best evidence rule.

The evidence tending to show a lack of testamentary capacity is scanty, but, considering it altogether, including the diversion of the estate from her own people to a stranger in blood, we conclude that under the scintilla rule it was sufficient to take the case to the jury.

The issue of the exercise of undue influence was not submitted, and properly so. There was submitted the question of whether or not Mrs. Akeman had in fact signed the will. The pleadings and evidence on this issue do not seem sufficient to have authorized the instruction, but it doubtless did no harm.

Going back to the rules of principles by which we are to be guided, as given in the early part of this opinion, we conclude, however, that the verdict is flagrantly against the evidence and upon that ground the judgment is reversed.