214 P.2d 864

## VANZANDT v. HEILMAN.

### No. 5209.

Supreme Court of New Mexico.

Feb. 13, 1950.

Mears & Mears, Portales, for appellant.
Jack M. Campbell, Roswell, H. M. Dow, Roswell, J. O. Seth, Santa Fe, Neil B. Watson, Artesia, Ross L. Malone, Jr., Roswell, Don G. McCormick, Carlsbad, amici curiae.

Compton & Compton, Portales, for appellee.

BRICE, Chief Justice.

The question is whether a contract to execute and deliver an oil lease, generally known as "Producer's 88 Lease," is void

for lack of mutuality. The trial court made findings of fact which are accepted by both parties as the facts in the case, leaving only the question of law stated at the beginning of this opinion.

The findings of fact and conclusions of law are in substance as follows:

The defendant, E. C. Heilman, on the 29th day of April, 1948, was the owner of the following described real estate, to-wit: All of the coal, oil, gas and other minerals in and under and that may be produced from the North Half of Sec. 14, Twp. 8, South of Rge. 34 East, N.M.P.M. in Roosevelt County, New Mexico.

On that date the plaintiff entered into a written contract with defendant whereby defendant agreed to lease to plaintiff under what is known as Producers 88 Lease, the above described real property. The contract provided that the lease which defendant so agreed to execute in favor of plaintiff, should contain, among others, the following provisions:

"* * * That the said lessor, for and in consideration of $1920.00 (Nineteen hundred twenty and no/100 Dollars) Cash in hand paid, receipt of which is hereby acknowledged and of the covenants and agreements hereinafter contained on the part of lessee to be paid, kept and performed, has granted, demised, leases, and let and by these presents does grant, demise, lease and let unto the said lessee, for the sole purpose of mining and operating for oil and gas, and laying pipe lines, and building tanks, power stations and structures therein to produce, save and take care of said products, all that certain tract of land situated in the County of Roosevelt, State of New Mexico, described as follows to-wit: The North half of Section 14, Township 8 So., Range 34 East, N. M. P. Meridian, and containing 320 acres, more or less.

"It is agreed that this lease shall remain in force for a term of ten years from this date, and as long thereafter as oil and gas, or either of them, is produced from said land by lessee.

\* \* \* \* \* \*

"If no well be commenced on said land on or before the 1st day of May, 1949, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, or to the lessor's credit in the ——— Bank at Guthrie, Oklahoma or its successors, which shall continue as the depository regardless of change in the ownership of said land, the sum of One hundred Sixty and no/100 dollars which shall operate as a rental and cover the privileges of deferring the commencement of a well for twelve months from said date. In like manner and upon like payment or tenders the commencement of a well may be further deferred for like periods of the same number of months successively. And it is understood and agreed

that the consideration first recited herein, the down payment, covers not only the privileges granted to the date when said first rental is payable as aforesaid, but also the lessee's option of extending that period as aforesaid, and any and all other rights conferred.

"Should the first well drilled on the above described land be a dry hole, then, and in that event, if a second well is not commenced on said land within twelve months from the expiration of the last rental period which rental has been paid, this lease shall terminate as to both parties, unless the lessee on or before the expiration of said twelve months shall resume the payment of rental in the same amount and in the same manner as heretofore provided. And it is agreed that upon the resumption of the payment of rentals, as above provided, that the last preceding paragraph hereof, governing the payment of rentals and the effect thereof, shall continue in force just as though there had been no interruption in the rental payments."

The lease also provided that defendant should receive one-eighth of the oil and gas produced by plaintiff from the leased land during the life of the lease, except that used for lessee's operations.

The consideration which was to be paid for the lease was its fair and reasonable value, and the contract to execute and deliver it was fairly entered into between the parties thereto. The plaintiff has been at all times material herein, ready, able and willing to comply with the contract, and to take and pay for the oil and gas lease, and continues to tender and offer to take and pay for it, and to comply with the contract. The defendant after contracting in writing to execute and deliver the oil and gas lease mentioned, refuses to deliver it.

The trial court concluded as a matter of law, the following: Because of the provisions contained in the proposed oil and gas lease, which has been set out herein, the contract so entered into between the plaintiff and defendant is lacking in mutuality of obligation and remedy and cannot be specifically enforced in a court of equity, and for that reason plaintiff is denied relief. Thereupon judgment was entered for the defendant, from which judgment plaintiff has appealed to this court.

The plaintiff (appellant) presents his case under one point, viz.:

The trial court erred in entering judgment for defendant, upon the ground that the contract so entered into between plaintiff and defendant is lacking in mutuality of obligation and remedy, and cannot be specifically enforced in a court of equity, because the lease contracted to be delivered by defendant to plaintiff contains the following provision, to-wit: "If no well be commenced on said lands on or before the 1st day of May, 1949, this lease shall ter-

minate as to both parties, unless the lessee, on or before that date shall pay or tender to lessor, or to the lessor's credit in the ———— Bank at Guthrie, Oklahoma, or its successors, $160.00 which shall operate as rental and cover the privilege of deferring the commencement of a well for twelve months from said date. In like manner and upon like payment or tenders, the commencement of a well may be further deferred for like periods of the same number of months successively."

There is no contention that the contract is invalid. The contention is that a court of equity will not enforce specific performance because of a lack of mutuality in obligation and remedy; that is, the lessee may cause the lease to terminate by refusing to start drilling a well, and refusing to pay the $160 rental in lieu of drilling, before the end of any one of the ten years of the lease term, which if paid would defer the drilling of a well for the succeeding year; while the lessor has no remedy whereby he could terminate it.

The doctrine of mutuality of obligation and remedy (or the want of it) was mentioned in some English cases in the early part of the 19th Century, Hamilton v. Grant, 1815, 3 Eng.Reprint 980; Flight v. Bolland, 1828, 38 Eng.Reprint 817; Pickering v. Bishop of Ely, 1843, 63 Eng.Reprint 109, and others; but it was not until later that any attempt was made to formulate it into a rule of law. Lord Justice Fry in his treatise on Specific Performance, published in 1848, originated the doctrine and stated it as follows:

"Sec. 460. A contract to be specifically enforced by the Court must, as a general rule, be mutual,—that is to say, such that it might, at the time it was entered into, have been enforced by either of the parties against the other of them. When, therefore, whether from personal incapacity to contract, or the nature of the contract, or any other cause, the contract is incapable of being enforced against one party, that party is, generally, incapable of enforcing it against the other, though its execution in the latter way might in itself be free from the difficulty attending its execution in the former." Fry on Specific Performance, 6th Ed.

"Sec. 463. The mutuality of a contract is, as we have seen, to be judged of at the time it is entered into; so that it is no objection to the plaintiff's right, that the defendant may by delay, or other conduct on his part subsequent to the contract, have lost his right against the plaintiff. * * *" Id.

In his first edition on Equitable Remedies, Professor Pomeroy followed Fry with some modifications, as follows: "If, at the time of the filing the bill in equity, the contract being yet executory on both sides, the defendant, himself free from fraud or

other personal bar, could not have the remedy of specific performance against the plaintiff, then the contract is so lacking in mutuality that equity will not compel defendant to perform, but will leave the plaintiff to his remedy at law." 6 Pomeroy Equity Jurisprudence, 1st Ed., Sec. 769.

Many courts followed the Fry doctrine without question; but in 1884 the Supreme Court of the Territory of New Mexico, in Borel v. Mead, 3 N.M. (Gild) 39, 2 P. 222, 223, refused to follow it, stating, through Chief Justice Axtell: "As to the second point, the condition of mutuality is, in general, sufficiently satisfied if there be any consideration on the one side as well as the other. It is also held that a court of equity, in actions for the specific performance of optional contracts and covenants to lease and convey lands, will enforce the covenant, although the remedy is not mutual, provided it is shown to have been upon a fair consideration. So it is also held not to be necessary to the specific performance of a written agreement that it should be signed by the party seeking to enforce it. If the agreement is certain, fair, and just in all its parts, and signed by the party sought to be charged, that is sufficient. The want of mutuality is no objection to its enforcement. The very nature of an option is unilateral; one party has property to sell, the other has only, perhaps, ability to make sales."

Justice Bell, concurring, stated:

"We now come to the question of the alleged want of mutuality between the parties. This is a question of some difficulty, and its meaning appears to have been variously understood by the courts. (Here follows a consideration of authorities.)

\* \* \* \* \* \*

"Upon all authorities above cited and upon principle, we see no reason why a person may not, for a good consideration, bind himself to do a thing, though he has no reciprocal remedy against the person to whom he is bound. If such unilateral agreement is based upon good consideration, and there be no other objection to it, we think that it should be enforced. In the case before us, it does not appear but that there was a perfectly valid consideration; one is presumed, as we have already decided upon the record before us.

"I have dwelt thus at length upon the subject of alleged want of mutuality, because my learned associate, in his opinion in the court below, principally bases the result arrived at there, upon the fact, that because there was no promise to pay, or actual payment and acceptance, there was no mutuality and no completed contract that equity would enforce."

In 1903, Professor Ames attacked Fry's doctrine, stating eight propositions at variance with it. See 3 Columbia Law Review page 1. Since then there have been nu-

merous criticisms of it in law reviews, Harvard L.Rev. (1887-8) 104; 16 Columbia L.Rev. (1916) 443; 20 Michigan L.Rev. (1921-2) 289; 71 Pennsylvania L.Rev. (1922-3) 371; 37 Harvard L.Rev. (1923-4) 162; 36 Yale L.Jour. (1926-7) 897; 8 Oregon L.Rev. (1928-29) 362; 5 Wisconsin L.Rev. (1928-30) 510; 30 West Virginia L.Quarterly (1931-2) 162; 13 Boston L.Rev. (1933-34) 308; 47 Harvard L.Rev. (1933-4) 1198; 20 Minnesota L.Rev. (1935-36) 225; 16 Boston L.Rev. (1936) 450; 26 Kentucky L.Jour. (1937-8) 129; 28 California (1939-40) 492; 13 Cincinnati L.Rev. (1939-40) 586; 21 Temple L.Quarterly (1947-8) 149; 36 Georgetown L.Jour. (1947-8) 220; II Schofield Constitutional Law & Equity 774; and others, opinions of courts and text books.

The controversy raged through articles in law reviews and decisions of courts, until a simple statement of the law by Judge Cardozo (later a justice of the Supreme Court of the United States) in Epstein v. Gluckin, 233 N.Y. 490, 135 N.E. 861, 862, now generally accepted as the law, eliminated the Fry and Pomeroy doctrines from modern law. Judge Cardozo's statement referred to is as follows: "What equity exacts to-day as a condition of relief is the assurance that the decree, if rendered, will operate without injustice or oppression either to plaintiff or to defendant. (Citing authorities.) Mutuality of remedy is important in so far only as

its presence is essential to the attainment of that end. The formula had its origin in an attempt to fit the equitable remedy to the needs of equal justice. We may not suffer it to petrify at the cost of its animating principle."

So far as our research discloses, the Cardozo pronouncement has met with universal approval. The following are a few of the comments: "The language of Judge Cardozo in Epstein v. Gluckin [233 N.Y. 490, 135 N.E. 861], broad and unnecessary to that decision as it may have been, is at least indicative of what in general may be said to be the modern attitude of the equity courts." John F. Beamis, Jr. in 16 Boston U.L.Rev. page 450.

In an article in 13 Boston U.L.Rev. by Abram W. Spiro, it is said:

"The result of the recent cases seems to be that Dean Ames' statement of the rule of mutuality of performance must give way, and its place must be taken by the general principles of equitable action expressed by Judge Cardozo. According to a noted text writer, 'Equity will grant specific performance in any case where such relief would normally be given irrespective of the principle of mutuality, provided the defendant is not left without adequate remedy after his enforced performance in case the plaintiff should fail to perform thereafter; so that the decree "will oper-

ate without injustice or oppression." ' Walsh on Equity, page 354."

"In New York, the ghost was effectively laid within the last year in a masterly opinion of the Court of Appeals, delivered by Justice Cardozo. 'If there ever was (such) a rule * * * in this jurisdiction,' he says, 'it has ceased to be a rule today.' " 71 Pennsylvania L.Rev. 373.

An article on the subject by Harlan F. Stone (afterwards Chief Justice of the United States) was published in 16 Columbia L.Review at page 443. After saying that the word mutuality had been used in a loose and inaccurate sense, it was said:

" * * * More accurately used, the term 'mutuality' refers to the rule very generally applied in equity that specific performance of a contract will not be decreed unless the defendant has received, or the court is in a position to give to the defendant, all that he is entitled to receive under the contract in exchange for the performance of it on his part. * * * Professor Pomeroy, in stating the essential elements of the right to specific performance, says that the contract to be specifically performed 'must be in general mutual in its obligation and its remedy.' He uses similar language in his book on Specific Performance of Contracts, and in this he follows substantially the statement of the doctrine of mutuality of remedy as it appears in Lord Justice Fry's treatise on

Specific Performance. This statement of Pomeroy's has often been made the basis of judicial decision, and has been repeatedly cited with approval by the New York courts, but like many other attempts at the formulation of a rule of law, without giving any clue to the reason of the rule, this statement has been most mischievous in its influence upon judicial decisions.

"Assuming a valid legal contract, free from fraud or duress or other unfairness in its formation, for the breach of which legal damages would be inadequate, why should equity set any limits upon its authority to compel specific performance? Obviously courts of equity, which are courts of conscience, do not recognize the moral or legal right of one who is a party to such a contract not to perform it. If, therefore, equity withholds its hand from compelling performance of the contract because of the mutuality rule, it does so not because it recognizes the right on the part of either party not to perform his contract obligation, but because of expediency or because it would do some injustice to the defendant by compelling him to perform his contract.

* * * * * *

"There is want of mutuality of remedy, then, when and only when the court is unable, for any reason, to insure the defendant's receiving that which he is entitled to receive in exchange for the performance

of his own promise. Or, stated in somewhat different form, a court of equity will not compel a defendant to perform his contract if it must leave him to pursue his remedy on the contract for legal damages."

In Vol. 20 of the Michigan Law Review, at page 292, Professor Durfee said, regarding mutuality of remedies: "The first years of the present century saw a simultaneous attack, from apparently independent quarters, upon this doctrine of equality or identity of remedy. Ashburner, in his 'Principles of Equity' (1902), said: 'It does not appear to form the ratio decidendi of any line of cases.' Mr. William Draper Lewis, in a series of scholarly articles in the American Law Register (1901–1903), traced the history of the doctrine, exposed the fallacy that underlay it, and showed that (barring a handful of decisions which are clearly opposed to the current of authority) the cases in which relief has been refused on the ground of want of mutuality involved on the facts a principle much more substantial than equality of remedy. Much the same results were achieved in brief compass by the late Dean Ames in a masterly article in the Columbia Law Review (1903). These scholarly lawyers demonstrated that the negative doctrine of equality of remedy never was the living law, the law in action. And though the courts continue all too frequently to repeat the old shibboleth, there is a growing tendency to accept the views of Ames and Lewis and to pronounce a sounder doctrine of mutuality."

The rule is stated in the Restatement of the Law of Contracts as follows:

"(1) The fact that the remedy of specific enforcement is not available to one party is not a sufficient reason for refusing it to the other party.

"(2) The fact that the remedy of specific enforcement is available to one party to a contract is not in itself a sufficient reason for making the remedy available to the other; but it is of weight when it accompanies other reasons, and it may be decisive when the adequacy of damages is difficult to determine and there is no other reason for refusing specific enforcement.

"Comment on Subsection (1):

"a. The law does not provide or require that the two parties to a contract shall have identical remedies in case of breach. A plaintiff will not be refused specific performance merely because the contract is such that the defendant could not have obtained such a decree, had the plaintiff refused to perform prior to the present suit. It is enough that he has not refused and that the court is satisfied that the defendant is not going to be wrongfully denied the agreed exchange for his performance. The substantial purpose of all attempted rules requiring mutuality of remedy is to make sure that the defendant will not be compelled to perform specifically without

good security that he will receive specifically the agreed equivalent in exchange. * * * " Restate, Law of Contracts, Sec. 372.

In the last edition of Pomeroy the old text is stated; followed in parentheses by its repudiation:

"Assuming that a contract has been completely concluded, and that it belongs to a class capable of being enforced, it must still possess certain essential elements and incidents, in order that a court of equity may exercise the jurisdiction to compel its performance. * * *

"It must be, in general, *mutual* in its obligation and in its remedy. This doctrine is constantly stated by the courts, but there are so many exceptions, especially with respect to the obligation, that the rule is far from universal. It may be said, however, as a general proposition, that where a contract was intended to bind *both* the parties, and for any reason one of them is not bound, he cannot compel performance by the other. (*So numerous and so varied are the execptions to this rule that it is at present of little force as a rule. It is held in many modern cases and is the view of the American Law Institute that 'The fact that the remedy of specific enforcement is not available to one party is not a sufficient reason for refusing it to the other party.'* Mutuality of obligation is one thing and mutuality of remedy another)."

(Our emphasis.) 4 Pomeroy Equity Jurisprudence, 5th Ed., Sec. 1405.

Regarding this rule, Williston states: " 'The rule as to mutuality of remedy is obscure in principle and in extent artificial, and difficult to understand and to remember.' It is impossible to attempt here to collect and differentiate all the decisions which have dealt with the matter. This is the less essential since the rule, if taken literally, is in conflict with numerous decisions, and its broader statements are falling into discredit. In the discussion of the cases mutuality of obligation as well as of remedy is often brought up; but the requirement of mutuality of obligation is simply a prerequisite to the formation of a valid bilateral contract, an obvious necessity, but better expressed in other language." 5 Williston on Contracts, Sec. 1433.

From the optional nature of certain provisions of the lease contracted to be executed, it is argued that it lacks mutuality. In an article in 13 Cincinnati Law Review, at page 587, on this question generally, it was said: "The word mutuality when applied to contracts is sometimes used in a loose sense to indicate the mutuality of obligation secured from the exchange of mutual promises. When used in this sense, mutuality is synonomous with consideration and is necessary for the formation of a binding bilateral con-

tract. A naked agreement to buy, without a corresponding agreement to sell, is unenforceable by either party because mutuality of obligation is lacking. However, mutuality of obligation is not necessary in all cases to have a binding enforceable contract. In unilateral contracts there is never such mutuality. Likewise in an option contract where valid consideration has been paid for the option, the optionee can compel the optioner to sell, but the optionee cannot be compelled to buy."

Also, see an article in Vol. 8 of the Oregon Law Review on the question of mutuality of option contracts, wherein it is said: "Yet no doctrine is more firmly established than that an option agreement can be made the subject of a bill for specific performance, provided the subject matter is of the type where specific performance is ordinarily given. But on a closer inspection we find the common sense reason of the thing. This is a serious business agreement. And while there is want of mutuality of court access, there is necessarily mutuality of substantial performance of contemplated obligation. It may be that one party will never choose to bind himself to the other. Well enough; the other contemplated this fact. If he does choose to bind himself to the other, he has no advantage; for before he can have that performance upon which he insists he must tender his own performance according to such agreement as was entered into. No complaint is made of unfairness in the granting of specific performance in these cases. Yet the party who gave the option, and who now undertakes to revoke it, could not himself have *any* court access, for the optioner is not bound to him." 8 Ore.L.Rev. p. 370.

And see generally the following cases: Nyder v. Champlin, 401 Ill. 317, 81 N.E. 2d 923, 5 A.L.R.2d 282; Lamprey v. Saint Paul & C. R. Co., 89 Minn. 187, 94 N.W. 555; Kludt v. Connett, 350 Mo. 793, 168 S.W.2d 1068, 145 A.L.R. 1014; Driebe et al. v. Fort Penn Realty Co., 331 Pa. 314, 200 A. 62, 117 A.L.R. 1091; 49 A.J. "Specific Performance" Secs. 35–36.

From the cases and comments referred to and quoted, we have come to the conclusion that the mere lack of mutuality of remedy in favor of the defendant is not ground for refusing equitable relief. As stated by Judge Cardozo in Epstein v. Gluckin, supra, "What equity exacts to-day as a condition of relief is the assurance that the decree, if rendered, will operate without injustice or oppression either to the plaintiff or defendant"; or, as stated by Judge Harlan Stone in his article quoted from 16 Columbia Law Review, "There is want of mutuality of remedy, when and only when the court is unable for any reason to insure the defendant's receiving that which he is entitled to receive in exchange for the performance of his own promise;"

provided the transaction is free from fraud, duress, unfairness or other inequities

Tested by these rules, we will determine whether the contract is void for "lack of mutuality."

First as to the lease which defendant contracted to execute. An oil lease does not create the ordinary relation of landlord and tenant; it conveys an interest in real property, Staplin v. Vesely, 41 N.M. 543, 72 P.2d 7, and this is now generally held, although the early decisions, with few if any exceptions, held that such interest was personal property. The lease which was to be executed by defendant was in the form used generally in this state in leasing land for exploration and production of oil and gas. The trial court found that the consideration to be paid for the oil and gas lease was a fair and reasonable value therefor; that the contract to execute and deliver the lease was fairly entered into between plaintiff and defendant. The only question is whether there was such "lack of mutuality of obligation and remedy" as that a court of equity should refuse to specifically enforce it.

It has long been held by the California courts that leases like the one in suit were void for lack of mutuality in obligation and remedy; indeed California has a statute to that effect, George v. Weston, 26 Cal.App.2d 256, 79 P.2d 110. But in recent decisions it has been held, contrary to earlier holdings, that such leases convey real property. Callahan v. Martin, 3 Cal. 2d 110, 43 P.2d 788, 101 A.L.R. 871; Pimentel v. Hall-Baker Co., 32 Cal.App.2d 697, 90 P.2d 588.

The courts of some states are in accord with George v. Weston, supra, but from the conclusion we have reached regarding the doctrine of mutuality of contracts, we are not inclined to follow these courts.

Now, the defendant entered into an agreement in writing whereby he agreed to execute and deliver to plaintiff an oil lease, the terms of which were agreed on. The "down payment" was to be $1920; which consideration, it was agreed, "covers not only the privileges granted to the date when said first rental ($160) is payable as aforesaid, *but also the lessee's option* of extending that period as aforesaid, and any and all other rights conferred."

The terms of the lease are plain and easily understood. The down payment was a consideration for the options plaintiff was authorized to exercise, and we find no reason why a court of equity should not grant specific performance. The fact that defendant agreed to accept money for options, and thus sold plaintiff the right to terminate the lease which he did not reserve for himself, would not render the lease, if executed, void for lack of mu-

tuality. Such leases are now generally held valid.

The Supreme Court of Oklahoma in Brown v. Wilson, 58 Okl. 392, 160 P. 94, L.R.A.1917B, 1184, held that a similar lease was void for want of mutuality; but the Brown case, though followed for some time, has long since been overruled. That court said in Ireland v. Chatman, 87 Okl. 223, 209 P. 408, 410: "This court in a long line of cases has held the lessee of an oil lease under an 'unless lease,' so long as he pays the rental in the manner provided, has an option to continue the lease in force, and is subject to termination at his will, which privilege he may exercise by failure to pay the stipulated rental, in which event the lease automatically terminates."

In Maud Oil & Gas Co. v. Bodkin, 75 Okl. 6, 180 P. 959, 960, the Oklahoma court said that it would hold "with the great weight of authority, that the down payment or cash bonus consideration in the lease supports all its covenants, and that an oil and gas lease is not subject to cancellation merely because of the presence of the surrender clause therein." Also see Magnolia Petroleum Co. v. Saylor, 72 Okl. 282, 180 P. 861.

In Hunter v. Gulf Production Co., Tex. Civ.App., 220 S.W. 163, 165, it was held that a provision in the lease authorizing its surrender by the payment of $1 to the lessor is binding on the parties. The Court said, "But it is well settled that an option contract, although unilateral, is binding upon the maker, if it is supported by sufficient consideration paid; and when so supported it can be enforced to the same extent as any other contract." To the same effect is Washburn v. Gillespie, 8 Cir., 261 F. 41.

The early Texas cases held that an oil and gas lease, similar to the one in suit, was void for lack of mutuality, Great Western Oil Co. v. Carpenter, 43 Tex.Civ. App. 229, 95 S.W. 57; but this holding has long since been overruled by the Texas courts. Corsicana Petroleum Co. v. Owens, 110 Tex. 568, 222 S.W. 154; Rosson v. Bennett, Tex.Civ.App., 294 S.W. 660; McEntire v. Thomason, Tex.Civ.App., 210 S.W. 563.

In Corsicana Petroleum Co. v. Owens, 110 Tex. 568, 222 S.W. 154, 155, a similar lease was held to be valid. The court stated: "We fail to see anything in the terms of the several agreements evidenced by the instrument which invalidates it. The finding of oil upon the land was merely prospective. For a valuable consideration, satisfactory to themselves, the grantors by the instrument gave the grantee the right to prospect upon the land for a definite period; the right to seven-eighths of the oil if found; the right, in lieu of its completing a well within the first year, to

extend the time for its completion, within the term of the grant, by its making the quarterly payments; and the right or option to surrender the lease by paying the sum of $5.00 and all other amounts due under it up to that time. There is nothing unlawful about such a contract, and the parties were privileged to make it. If the grantors were willing to accept the quarterly payments instead of the completion of a well within the original period stipulated for its completion, that was their affair. They contracted to that effect by the instrument. The contract being fair, there can be no reason for a court's striking down that part of it."

In Hinerman v. Baldwin, 67 Mont. 417, 215 P. 1103, 1108, it was stated: "As to want of mutuality, it is urged that by the terms of the lease, as executed, the lessee is permitted to surrender the lease and avoid liability 'upon the payment of $——, which constitutes a unilateral contract and is therefore void; it being contended that the lease is a nullity, because it gives the lessees the right to cancel it without a corresponding right to the lessor. Generally it is not essential that each covenant of agreement of the lessor shall be supported by specific reciprocal covenant or agreement by the lessee. It is sufficient if the contract contain mutual obligations binding upon both parties. A consideration having been paid for the lease, the surrender clause in favor of the lessees does not render the contract void for want of mutuality, even though incomplete as to the amount to be paid on surrender. Although such provision may be considered unilateral, consideration having passed for the execution of the contract, it is not rendered void because of want of mutuality in the surrender clause."

The late decisions of the Texas and Oklahoma courts, in our opinion, should be followed by this court, as being consistent with our views on the question of mutuality of obligation and remedy as applied to contracts.

■ But it is said that the question here is not whether a lease if executed would be void, but whether the contract to execute it could be specifically enforced in this action. That is true, but a contract to execute an oil and gas lease, should be construed as any other contract for the sale of an interest in land. We find no equitable ground for refusing specific performance of the present contract.

"For the purpose of equity jurisdiction contracts for leases are in the nature of contracts for the sale of an interest in lands, and where there is a valid contract equity has granted specific performance. In at least three states specific performance of contracts to give an oil and gas lease has been refused where the lease, when made, was to contain a surrender clause, or a provision that it should be void if the

lessee did not commence to drill within a stipulated time. It is said that there is no mutuality of obligation and that a court of equity will not compel an act by one party where the other is not bound. This view is erroneous. If it were followed, the result would be that a contract to give an unless lease could never be specifically enforced. Yet, such leases are everywhere regarded as valid when made and have been the subject of specific performance. That the lessee must pay an initial consideration for the lease would seem to be a sufficient answer to the objection of lack of mutuality of obligation. As to the second objection, lack of mutuality of remedy, it is extremely unlikely that a lessee would go to the trouble and expense of a suit in equity in order to get a lease which he intended immediately to surrender or allow to become void by failure to drill. Furthermore, that is the contract to which the parties agreed, and there is no reason to deny specific performance of the agreement so long as the lessee has not in fact surrendered his rights." I Summers Oil & Gas., Sec. 195.

This text is supported by Texas authorities; Lockwood v. Frost, Tex.Civ.App., 285 S.W. 874; Paul v. Stanolind Oil & Gas Co., Tex.Civ.App., 83 S.W.2d 808; and see a number of authorities cited below the text last quoted from Summers on Oil and Gas. In most of these cases specific performance was denied, but not because of the lack of mutuality of obligation or remedy.

"Where a valid contract for a lease has been executed, a court of equity will decree a specific performance, and compel the execution of a lease in accordance with the terms of the contract, but the court will not decree a working of the premises to which the contract relates, leaving the parties to their action for damages. * * *" II Thornton, Oil & Gas., Sec. 455.

 We are of the opinion that the trial court erred in denying specific performance of the contract to execute the oil and gas lease.

The decree is reversed and cause remanded, with instructions to the district court to set aside its decree and enter a decree for the plaintiff.

It is so ordered.

LUJAN, SADLER and McGHEE, JJ., concur.

COMPTON, J., did not participate.