609 P.2d 337

**Robert E. McCOY and Corrine McCoy, Plaintiffs-Appellants,**

v.

**Arthur L. ALSUP, Kim Alsup, Vernon D. Beevers, Cyd A. Beevers, Arthur R. Webb and Barbara S. Webb, Defendants-Appellees.**

**No. 4146.**

Court of Appeals of New Mexico.

Feb. 26, 1980.

Rehearing Denied March 7, 1980.

Gary Harrell, Briones, Harrell & Wills, P.A., Farmington, for plaintiffs-appellants.

Richard J. Gallagher, Gallagher & Curtis, Farmington, for defendants-appellees Webb.

William J. Cooley, Burr & Cooley, Farmington, for defendants-appellees Alsup & Beevers.

## OPINION

SUTIN, Judge.

McCoy sued defendants, Webb, Alsup and Beevers for specific performance of an agreement executed by the parties and for damages.

The written agreement, attached to the complaint, was one in which the parties stipulated and agreed that:

1. On July 19, 1972, McCoy executed a warranty deed to Webb with an erroneous description of the land.

2. Alsup and Beevers wanted to purchase the land which McCoy had attempted to sell to Webb.

3. To correct the error, McCoy agreed to institute legal proceedings which would authorize him to execute warranty deeds on behalf of himself and two minor children and convey to Webb an "L" shaped parcel of land. Upon obtaining the authority, McCoy would execute the deeds.

4. Webb agreed to execute a warranty deed to McCoy of the land erroneously conveyed by McCoy to Webb.

5. Defendants agreed to enter into a real estate contract between Webb as vendor and Alsup and Beevers as vendees on the land originally intended to be sold by McCoy to Webb. Alsup and Beevers could take immediate possession upon execution of the real estate contract.

6. All parties acknowledged that they had been informed by their respective lawyers of the title problems involved and the necessity of litigation regarding said problems.

After trial, the court made the following pertinent findings:

\* \* \* \* \* \*

9. Alsup and Beevers signed the documents as plaintiff's Exhibit 8 [the writing, supra] on July 16, 1976.

10. Webb signed the documents marked plaintiffs' Exhibit 8 on July 19, 1976.

* * * * * *

19. That on or shortly after July 19, 1977 [sic], the defendant transmitted to plaintiffs' attorney an offer to compromise the differences between the parties. [By this is meant that defendants having signed the writing, supra, offered it to McCoy.]

20. That the defendants, acting by and through their attorney, withdrew the above-referred offer before it was accepted by plaintiffs.

* * * * * *

11. On August 16, 1976, Webb executed deeds * * * conveying the property * * * to Alsup and Beevers. [This was the same property that McCoy had deeded to Webb.]

* * * * * *

The trial court concluded:

* * * * * *

5. That no contract or agreement ever existed at any material time hereto between plaintiffs and defendants with respect to the subject matter of this action.

* * * * * *

Judgment was entered for defendants and McCoy appeals. We reverse.

If we read the pertinent findings correctly, defendants executed the instrument and offered it to McCoy, but defendants' attorney withdrew this offer on or about August 16, 1976 before McCoy accepted it and therefore no agreement ever existed. Therefore McCoy was not entitled to specific performance.

The crucial issue is:

Did McCoy and defendants enter into a valid contract? Is there substantial evidence to support Finding No. 20, that defendants, acting by their lawyers withdrew the offer on or about August 16, 1976 before it was accepted by McCoy?

On appeal, McCoy erroneously claims that he and defendants reached an oral contract; that the "agreement" was a memorialization of the oral contract, and not an offer, and that defendants breached the contract. The case was not tried on this theory. McCoy sued defendants for specific performance of the written "Agreement," not an oral contract. Nevertheless, neither the trial court nor this Court can find such facts and circumstances brought out by McCoy as to raise any convincing implication that the contract was orally made, so as to satisfy us of its terms. *Schauer v. Schauer*, 43 N.M. 209, 89 P.2d 521 (1939). For specific performance of oral contracts see, *Shipp v. Thomas*, 58 N.M. 190, 269 P.2d 741 (1954); *Provencio v. Price*, 57 N.M. 40, 253 P.2d 582 (1953). McCoy was not entitled to any relief under this theory.

The problem with which we are involved is solely contractual. Was defendants' "offer" effectively withdrawn before McCoy accepted it? If so, there was no contract. If defendants' offer was not withdrawn but accepted by McCoy, then a valid contract existed and McCoy was entitled to specific enforcement thereof.

The contractual rule is stated in *Tatsch v. Hamilton-Erickson Manufacturing Co.*, 76 N.M. 729, 734, 418 P.2d 187 (1966):

An offer not under seal or given for a consideration may be withdrawn at any time prior to an unconditional acceptance by the offeree. 1 Williston on Contracts, 3d Ed., § 55. And, *any statement clearly implying an unwillingness to contract according to the terms of the offer*, communicated to the offeree prior to an unequivocal and unconditional acceptance of the offer is sufficient even though the word "revoke" is not used. * * * [Emphasis added.]

To arrive at a conclusion, we must carefully delineate the facts and circumstances surrounding the preparation of the written instrument called the "offer," and the claimed withdrawal thereof.

Defendants' lawyers prepared the "offer" on July 15 or 16, 1976. It was signed by Alsup and Beevers and acknowl-

edged on July 16, 1976 and by Webb on July 19, 1976.

Defendants' lawyer testified that after Webb signed the instrument on July 19, 1976, he forwarded the instrument to McCoy's lawyer. We have no knowledge of the reason it was forwarded. We must assume that it was forwarded for the purpose of having McCoy's lawyer obtain the signatures of McCoy. Although the "offer" shows that it was signed by McCoy and acknowledged on July 4, 1976, it is obvious that this date was a mistake. The month "July" was typed in the acknowledgment and the "4th" was written in by the notary public. Despite the testimony of the notary public and Mrs. McCoy that the signatures were acknowledged on July 4, 1976, two years had passed and they were mistaken. McCoy testified that the signatures were acknowledged on August 4, 1976 and certainly before August 16, 1976, the crucial date involved. Nevertheless, there is no evidence that the acceptance was conveyed to defendants or their lawyer before August 16, 1976, the date defendants claim the offer was withdrawn.

■ The rule is universal that an offer becomes a binding promise and results in a contract only when it is accepted. 17 C.J.S. *Contracts* § 39 (1963).

Without any knowledge whether the McCoys had executed the agreement, defendants' lawyer testified that a day or two prior to the Webb-Alsup-Beevers real estate deal on August 16, 1976, he had a conversation with Webb. Webb told him that Webb had run into McCoy at the Plateau Refinery and McCoy said something to the effect that he either wouldn't or couldn't execute the agreement at this time. Webb testified that this conversation took place on July 19, 1976 after the Webbs had signed the instrument. Evidently, Webb did not notify his lawyer until *August 14 or 15, 1976.*

After the conversation with Webb, defendants' lawyer called McCoy's lawyer but he did not remember exactly what he told him. He could not recall the conversation, but he got the impression that Webb told him that since McCoy would not or could not sign the agreement, defendants were fed up and were going to terminate the deal and go ahead with the sale of the property as a rectangle from Webb to Alsup and Beevers. Defendants' lawyer never said the "offer" is withdrawn. When the defendants would terminate the deal, if at all, was never disclosed. This narration may or may not have implied "an unwillingness to contract according to the terms of the offer" fixed by defendants.

Nevertheless, by letter dated *August 17, 1976,* McCoy's lawyer wrote defendants' lawyer as follows:

Enclosed is *xerox copy of executed Agreement* between the parties under date of July 4, 1976. *It is my understanding from our telephone conversation that as soon as legal action has been taken in order that Deeds can be exchanged, that the parties will exchange Deeds at that time.* [Emphasis added.]

The original copy of the agreement was retained. Upon receipt of the xerox copy of the executed agreement, defendants knew that McCoy had accepted the "offer" made. The emphasized language is consonant with McCoy's testimony about his conversation with Webb. McCoy testified on cross-examination:

I said I could sign the agreement, but I was unable to sign the deeds until I obtained legal authority to sign for my two minor daughters.

Even though the August 17 letter is diametrically opposed to the testimony of defendants' lawyer, defendants' lawyer was asked the following question to which he made the following answer:

Q. After having given this notice to * * * [McCoy's lawyer], did you receive objection from anyone in the world to proceeding with the closing *as you announced that Webb, Beevers, and Alsup were going to do?*

A. I remember I looked through my file and I had a letter from * * * [McCoy's lawyer] returning the executed agreement to me, but there was nothing objecting to our conversation. [Emphasis added.]

The August 17 letter did not object to the conversation, it stated the truth of the conversation. Upon receipt of the August 17 letter, defendants' attorney did not respond orally or in writing with reference to the veracity of the telephone conversation stated in the letter.

 The failure to reply to a written communication does not ipso facto impose such an obligation upon a person who receives it. There are circumstances, however, under which unanswered letters are competent evidence of admission by silence as to the statements therein contained. The test is found in whether the circumstances are such that, in the ordinary practice of mankind, the party receiving the letter would have answered it if he did not acquiesce in or assent to, the statements made in the letter. *Martin v. New York Life Insurance Co.*, 30 N.M. 400, 234 P. 673, 40 A.L.R. 406 (1925); *Merry v. Georgia Big Boy Management, Inc.*, 134 Ga.App. 707, 218 S.E.2d 694 (1975); *Allstate Insurance Company v. Ormand*, 252 Ark. 773, 480 S.W.2d 939 (1972); 31A C.J.S. *Evidence* § 297(b), pp. 762–3 (1964).

In *Martin*, the court said:

* * * To what extent and under what conditions a self-serving unanswered letter or telegram passing between persons in the general course of business is admissible in favor of the person sending it has been the subject of much discussion by the courts and the decisions are not harmonious. *The general trend of the decisions is to the effect that such a letter is admissible, but only as an admission implied from the silence of the recipient.* * * * [Emphasis added.] [30 N.M. at 414, 234 P. at 679.]

█ In the instant case, the testimony of defendants' lawyer was crucial in the determination of whether the contractual "offer" had been withdrawn. It was admitted that defendants' lawyer received the August 17 letter. The letter stated that the written agreement would go forward to consummation. There was no explanation of what occurred after receipt of the August 17 letter. Perhaps, defendants' lawyer misread the letter. Perhaps he did not disclose the contents of the letter to defendants. The language in the letter is clear and precise. Under normal circumstances in the experience of lawyers, if defendants' lawyer had read the letter and did not acquiesce in, or assent to, the statements made, he would have taken issue. Silence implied assent to the correctness of the conversation. Dissent would in ordinary experience have been expressed if the communication had not been correct.

Silence of defendants' lawyer constituted an admission that in the conversation with McCoy's lawyer, it was their "understanding * * * that as soon as legal action has been taken in order that Deeds can be exchanged, that the parties will exchange Deeds at that time." Defendants' lawyer did not withdraw the "offer" made to McCoy.

On December 8, 1976, McCoy's attorney wrote to Alsup that "We are undertaking on behalf of the McCoys legal proceedings to enable the parties to correct the description." In this letter, McCoy gave notice to Alsup that he cease erection of a fence in an improper location. There was no response.

█ Defendants' lawyer's recollection at trial, two years after the conversation with McCoy's lawyer, was mistaken. "The certainty of memory begins to fade with the passage of time. Decisions based on memory are as uncertain as the testimony of witnesses who seek to recollect the facts of an event that occurred two years ago." *Weiss v. Hanes Mfg. Co.*, 90 N.M. 683, 687, 568 P.2d 209 (1977). A writing is entitled to more weight than statements founded merely on memory. As quoted in *American Ins. Co. v. Paggett*, 73 Ind.App. 677, 128 N.E. 468, 470 (1920):

"Some memories are like sieves, and as said by the court in *Miller v. Cotten*, 5 Ga. 341, 349: 'I would sooner trust the smallest slip of paper for truth, than the strongest and most retentive memory ever bestowed on mortal man.'"

An unimpeached writing must be accepted under the best evidence rule in preference to parol evidence based on memory. *Duff v. May*, 245 Ky. 709, 54 S.W.2d 4 (1932); *Glasgow Ice Cream Co. v. Fults' Adm'r*, 268 Ky. 447, 105 S.W.2d 135 (1937); *Prudential Ins. Co. of America v. Oaks*, 282 Ky. 577, 139 S.W.2d 62 (1940).

The lawyers, like their clients, were discussing the execution of the deeds, not the agreement. What is of real significance is that McCoy's lawyer never notified McCoy that the "offer" had been withdrawn, if, in fact, he had been so notified, and that the agreement was of no effect. On August 16, 1976, defendants silently effected their real estate transaction. Because, as Webb put it, "there was no time limit of when he would or when he could, and Alsup and the Beevers were either wanting to sell or either get on or get off." Neither before or after August 16, 1976, did defendants or their lawyer notify McCoy of the withdrawal of the "offer." McCoy did not learn of this fact "until everything had been done."

▮ We hold that there was no substantial evidence to support the court's Finding No. 20 that defendants withdrew the "offer" before it was accepted by McCoy.

▮ On January 2, 1977, McCoy filed his petition in the district court of San Juan County for authority to consummate the agreement on behalf of his two minor children. The executed agreement was attached to the petition as an exhibit. The order granting the petition was entered on March 23, 1977. With one of his children residing in California, we hold that this proceeding was completed within a reasonable time. On June 2, 1977, McCoy notified defendants that McCoy had a deed ready to sign, and enclosed deeds for defendants to sign. Defendants refused and this action was filed. McCoy had completed his duties under the agreement.

▮ The only remaining issue is whether McCoy is entitled to specific performance of the agreement and damages, if any. During the trial of this case, defendants did not contest McCoy's right to specific performance based upon his demand that defendants be compelled to perform the agreement in the precise terms agreed upon. Defendants prepared the terms and conditions of the agreement. No defense could be made that relief, if granted, would operate with injustice or oppression on defendants, nor that the agreement was uncertain, unfair and unjust in all its parts.

▮ "Specific performance is the actual accomplishment of a contract by a party bound to fulfil it, and is a means of compelling a party to do precisely what he ought to have done without being coerced by a court." *Board of Education v. O'Bannon*, 26 N.M. 606, 610, 195 P. 801 (1921). This equitable remedy applies to an exchange of real estate. *Mundy v. Irwin*, 20 N.M. 43, 145 P. 1080 (1915). The doctrine of mutuality of obligation and remedy was abandoned in 1950 and the Cardozo rule was adopted. *Vanzandt v. Heilman*, 54 N.M. 97, 214 P.2d 864 (1950). The Cardozo rule was quoted as follows:

"What equity exacts to-day as a condition of relief is the assurance that the decree, if rendered, will operate without injustice or oppression either to plaintiff or [to] defendant. (Citing authorities.) Mutuality of remedy is important in so far only as its presence is essential to the attainment of that end. The formula had its origin in an attempt to fit the equitable remedy to the needs of equal justice. We may not suffer it to petrify at the cost of its animating principle." [Id. 103, 214 P.2d 867.]

The *Vanzandt* court pointed to territorial days when the Supreme Court then pointed out that in actions for specific performance, a court of equity will enforce a covenant to convey lands although the remedy is not material, provided it is shown to have been upon a fair consideration. It quoted the following:

"* * * *So it is also held not to be necessary to the specific performance of a written agreement that it should be signed by the party seeking to enforce it. If the agreement is certain, fair, and just in all its parts, and signed by the party*

*sought to be charged, that is sufficient.* * * * *" [Emphasis added.] [Id. 102, 214 P.2d 867.]

In other words, the signature of McCoy was not the controlling factor. If McCoy or his lawyer had notified defendants that the "offer" was acceptable as written, he would have been entitled to specific performance.

Specific performance of contracts is an equitable remedy most useful in the protection of contract rights. Equity proceeds upon the assumption that the normal end or termination of every contract is performance in accordance with the agreement. To do more complete justice than can be had in an action at law, equity requires specific performance of the contract.

■ In addition to specific performance, McCoy sought compensatory and exemplary damages. We can find no reasonable basis to award exemplary damages. *Seegers v. Spradley*, 522 S.W.2d 951 (Tex.Civ.App. 1975).

In November, 1976, Alsup removed the fence from the west side of the "pink" area as shown on McCoy's Exhibit 4, and constructed a fence along the east side of such "pink" area. This "pink" area was land erroneously conveyed by McCoy to Webb and constituted about 7½ acres. Subsequent to the construction of the fence, Alsup plowed up the alfalfa and permanent pasture which was located in the "pink" area. The cost of moving the fence was $608.40, for disking and resealing $1,324.60, for a total of $1,933.00. McCoy also claims damages of $3,900.00 for not having the right to grow and sell 600 bales of hay. This claim of damages is speculative.

■ An award of damages or ancillary relief in a suit in equity for specific performance is given only in exceptional cases. *Belleville v. Davis*, 262 Or. 387, 498 P.2d 744 (1972). "As a general rule, courts ordinarily do not grant damages in addition to specific performance, in large part because such an award would constitute an inequitable windfall for the promisee, at least where specific performance alone of the contract affords the promisee the full bene-fit of his bargain." *Ebright v. Shutter*, 254 Pa.Super. 509, 386 A.2d 66, 68 (1978); 81A C.J.S. *Specific Performance* § 197 (1977); 71 Am.Jur.2d *Specific Performance* § 216 (1973). "By its very nature, a suit for specific performance affirms the contract and seeks that it be enforced. The purchaser is not due both specific performance of the contract and damages for its breach. [Authorities omitted.] Rather, the Court in decreeing specific performance will adjust the equities of the parties in such a manner as to put them as nearly as possible in the same position as if the contract had been performed *according to its terms*. [Authorities omitted.] Specific performance is what the term implies—enforcement of the contract as nearly as may be to accomplish its purpose. [Authorities omitted.] Plaintiff is now bound by the terms of that contract and is entitled to no more than it provides." [Emphasis by court.] *Tri State Mall Associates v. A.A.R. Realty Corp.*, 298 A.2d 368 (Del.Ch.1972); see, *Annot., Specific Performance: compensation or damages awarded purchaser for delay in conveyance of land*, 7 A.L.R.2d 1204 (1949).

■ The true measure of damages ancillary to relief for specific performance is to place the parties in the same position they would have been if the contract had been performed according to its terms. *Tri State Mall Associates, supra; Hellkamp v. Boiman*, 25 Ohio App.2d 117, 267 N.E.2d 323 (1970); *Four-G Corporation v. Ruta*, 56 N.J. Super. 52, 151 A.2d 546 (1959); *Lombardi v. Laudati*, 124 Conn. 569, 200 A. 1019 (1938).

McCoy is entitled to $1,933.00 damages.

Reversed. This cause is remanded to the district court to vacate its judgment, enter judgment of specific performance for McCoy and award him $1,933.00 as damages.

IT IS SO ORDERED.

LOPEZ, J., concurs.

WOOD, Chief Judge (specially concurring in part and dissenting in part).

The evidence is undisputed that the deed from McCoy to Webb did not accurately

describe the land involved in the sales transaction between these parties. The trial court found that McCoy and Webb believed the deed described the land which McCoy was selling to Webb. The trial court found that the mistake in the description was discovered when Webb was negotiating with Alsup and Beevers to sell the land which Webb purchased from McCoy. These findings are supported by clear and satisfactory evidence. See *Butler v. Butler*, 80 N.M. 36, 450 P.2d 922 (1969).

The trial court concluded that there was a mutual mistake concerning the land description as between McCoy and Webb. Inasmuch as Alsup and Beevers knew of the mistake before they purchased the land, using the erroneous description, Alsup and Beevers are not insulated from the consequence of the mutual mistake because not bona fide purchasers. *Kimberly, Inc. v. Hays*, 88 N.M. 140, 537 P.2d 1402 (1975).

Although the trial court concluded there had been a mutual mistake, it nevertheless denied relief to the McCoys. The trial court should have reformed the deed description. *Morris v. Merchant*, 77 N.M. 411, 423 P.2d 606 (1967); *Wright v. Brem*, 81 N.M. 410, 467 P.2d 736 (Ct.App.1970).

Webb seeks to take advantage of his mistake, which was part of the mutual mistake, by claiming that mistake was a theory neither pled nor proved. McCoy's complaint relied on the document discussed in Judge Sutin's opinion. This document was signed by all the parties; the document acknowledges the mistake in the description by setting forth the action to be taken to correct the description. In addition, the mistake in the description was the basis for the lawsuit. Although not specifically pleaded, "mistake" was tried, and the trial court properly made findings concerning mistake. Rule of Civ.Proc. 15(b).

Alsup and Beevers seek to avoid any consequence to them of the mistake on several grounds. Their claim that "mistake" was not an issue to be decided is answered in the preceding paragraph. Their claim that a mutual mistake between McCoy and Webb was not proven is answered by the trial court's finding. Their claim that they were not involved in the mistake and, thus, should suffer no consequence from the mistake is answered by the trial court's finding that they knew of the mistake before they purchased from Webb.

I do not concur in Judge Sutin's opinion. However, because the trial court should have reformed the deed description, but failed to do so, I join that part of Judge Sutin's opinion which directs the trial court to order specific performance of the agreement to correct the erroneous description.

I agree with Judge Sutin that the record does not show a basis for exemplary damages. I do not agree that this Court should award compensatory damages in favor of McCoy. If the award is against Webb, it is improper because the trial court granted judgment for Webb at the close of McCoy's case, before Webb was required to present his defense. If the award is against Alsup and Beevers, it is improper because the trial court made no damage findings and that should be left, initially, to the trial court. I would remand the question of compensatory damages to the trial court with instructions to decide the question of compensatory damages after an evidentiary hearing limited to that question.